JENNIE VAN TASSEL (EMMA R. CARTER) ET ALS. *vs.*
THE SPRING PERCH COMPANY ET ALS.

Third Judicial District, New Haven, June Term, 1931.

MALTBIE, C. J., HAINES, HINMAN, BANKS AND AVERY, Js.

637

Argued June 2d—decided July 29th, 1931.

*David S. Day,* for the appellants (plaintiffs).

*William H. Comley,* for the appellees (defendants).

HAINES, J. The defendant The Spring Perch Company is a joint stock corporation organized in 1854 under the statute laws of this State, and the relevant portions of its articles of association read as follows: "Art. 1st. The name of said corporation shall be the Spring Perch Company, which shall be established and located in the city of Bridgeport, county of Fairfield and state of Connecticut." "Art. 3d. The purposes for which the corporation is established are as follows, viz: The manufacturing of Coach and Carriage Springs of all kinds, Spring Perches, Axles, Machinery, Mechanics Tools, Coach Locks, Carriage Hardware, Iron and Brass Castings of all kinds, and the working

and silver-plating of the same in every form and manner, and for buying and selling the same in a manufactured or unmanufactured state, as the business may require; the purchase and sale of lands, buildings, machinery, or anything proper to the carrying on of said business."

The capital stock authorized and fully subscribed was eight hundred shares of common stock at a par value of $25 per share, and by reason of increases from time to time, the capital stock now consists of two thousand shares of common at a par value of $25 per share and fifteen hundred shares of preferred at a par value of $100 per share—a total capital of $200,000. There has been otherwise no change in the articles of association in its more than seventy-five years of existence. Of this capital stock, the plaintiffs own eight hundred shares of common and six hundred and twenty-five shares of preferred.

There are five directors—the plaintiffs Frederick S. Hawley, president, and his son Thomas G. Hawley, and the defendants John C. Hawley, treasurer, a half-brother of the president, Harold T. Dow, secretary, and Alfred H. Knapp.

From 1854 to 1917 the manufacturing plant of the company was located at Bridgeport. Desiring to move to Stratford in this State, and to obtain funds for financing that project, an issue of $150,000 preferred stock was authorized upon the vote of all the then stockholders at a meeting held in June, 1917, for that purpose, and the plant has ever since been located at Stratford.

At a directors' meeting held November 10th, 1930, with all members present, the resolution appearing in the footnote was adopted, the two plaintiffs herein

"Whereas the Spring Perch Company has been engaged in business since the third day of June, 1854, in the manufacture of car-

voting against and the three other directors in favor of it.

riage springs, automobile springs, and sundry equipment for carriages and motor vehicles, and

"Whereas the company is now in an excellent financial position, and

"Whereas the Company enjoys the highest reputation in the trade for the excellence of the product which it manufactures, and may reasonably expect to capitalize its good will, its assets and reputation for the benefit of the stockholders, for many years to come, provided the directors are diligent in the matter of manufacturing economies, and

"Whereas it appears that the sources from which the Spring Perch Company draws its raw material have gradually centered in the middle west, and that the market in which it sells its product is now located in what is now termed the Detroit Territory, and

"Whereas the cost of freight on receiving raw materials, and the cost of freight on delivering the finished product to market, amounts each year to more than fifty thousand dollars ($50,000) than said item of freight would cost the Company if it had a plant situated in the so-called Detroit Territory, and

"Whereas some of the officers of the company, over a long period, have made a careful study of the situation, and have sought the advice of Industrial Experts with respect to the advantages which would be enjoyed by the company if it established a plant in the so-called Detroit Territory, and

"Whereas after making a careful study of the situation, and receiving from competent sources advice with respect to the same, it appears that the company can produce its product at a much larger profit if it establishes a plant somewhere in the Detroit Territory.

"RESOLVED: That the corporation proceed at once to make plans and preparations to establish a spring manufacturing plant at such place or location, in the so-called Detroit Territory, which territory shall be deemed to include Buffalo, Lackawanna, Cleveland, Toledo, Detroit, or any other cities or towns in the vicinity of any of said cities, and to do all things necessary, desirable or incidental to the establishment of a spring manufacturing plant in such territory or territories; and for that purpose, John C. Hawley, as Treasurer of the Company and Harold T. Dow as Secretary of the Company are hereby authorized and directed to immediately proceed, subject to the approval of the Board of Directors, to choose a location in said Territory, for a spring manufacturing plant, to purchase or to build and construct a suitable and adequate spring manufacturing plant, including the proper purchase or lease of land therefor, on such terms and conditions as may seem proper, to purchase, lease or con-

The plaintiffs filed a written protest and objection to the submission and passage of the resolution, setting forth their objections thereto, being in substance that it authorized a change in the location and establishment of the corporation without the concurring vote of two thirds of the capital stock; that it changed the fundamental nature of the company's business without the consent of all the stockholders, and that it imposed an unreasonable and unwarranted risk upon the stockholders and an improper application of the accumulated profits of the company.

In the present action these plaintiffs deny the right of the directors to pass and put into effect that resolution, but it is supported by all the other stockholders of the company. It is the present desire and intent of the majority directors to carry out the terms of the above resolution and remove part or all the plant of the company from its present location in Stratford to the Detroit Territory.

The business of the company has been built up and maintained on the basis of a manufactured product of particularly high quality which has in many instances

---

struct all necessary equipment for said plant, and from time to time to remove from the spring manufacturing plant in Stratford so much of the equipment as in their opinion may be desirable to install in said proposed new plant, and from time to time transfer from said Stratford plant to said new plant as much of the business or manufacturing operations of the corporation as, in their judgment shall be proper or expedient so to do, and to do all things necessary or incidental to diligently and efficiently establish a spring manufacturing plant in the so-called Detroit Territory.

"The said John C. Hawley and Harold T. Dow, from time to time, shall report the progress of their negotiations and their doings to the Board of Directors, in order that the Board of Directors may from time to time give or withhold its assent or approval and further direct the officers of the company with respect to establishing the said spring manufacturing plant. Nothing in this resolution shall be construed to take away from the Board of Directors, its proper supervision and management of the company's affairs."

enabled it to sell to automobile manufacturers at prices above prices charged by competing spring manufacturers; but within the last few years conditions in automobile manufacture have changed in such a way that quality requirement for springs has become less important, and the company has had increasing difficulty in marketing its products, only three of its regular customers remaining with it. The result has been a steady decrease in the net profits of the company and for the year 1930 there was a substantial loss. The establishment of the proposed plant in the Detroit District would necessitate the expenditure of "a substantial amount of the assets" of the company.

The foregoing facts found by the trial court are sufficient in outline to present the three important claims made by the plaintiffs on this appeal, and further facts will be referred to if need arises. These three claims may be stated as follows: (1) The proposed removal constitutes a fundamental change in the corporate plan, scope and purpose of the company, and so by law, requires the consent of all the stockholders. (2) The proposed removal in and of itself requires, under § 3461 of the statutes of this State, the concurring vote of two thirds of the capital stock, preferred and common, and (3) the proposed removal would, under the circumstances, expose the assets of the company to danger of waste.

We concur in the appellants' claim that the legality or illegality of the proposed removal must be determined upon the assumption that the action contemplated by the resolution is the removal of the entire plant from this State. The appellees point out that the resolution does not aim to change the domiciliary location of the company and its only effect is to authorize the doing of part of the corporate business outside the State. The legal right of a corporation to

transact business outside the State cannot be seriously questioned in the absence of any prohibitory statute or charter provision. "It is implied in the charter or articles of association of every corporation, in the absence of an express provision to the contrary, that the business of the company may be carried on in the usual manner, by the usual agencies, abroad as well as at home. The shareholders of the company must be held to have impliedly agreed to this, and to have invested the company's agents with the necessary authority." 2 Morawetz, Private Corporations (2d Ed.) § 958.

Moreover, it is manifest that the company has always done business out of the State in the purchase of raw material and in marketing its product and must continue to do so if it continues in operation, while retaining its domicil in the State of its incorporation. The appellants do not contest this right, but they insist that the articles of association, by prescribing that the company "shall be established and located" in this State, require that the *situs* of its physical plant shall be in Connecticut, and hence its removal from the State would be a fundamental change in the chartered scope, plan and purpose of the corporation, and thus beyond the legal powers of the board of directors.

The statutory provisions in effect in 1854 when the corporation was formed, prescribed only brief requirements for the articles of association. They must be in writing, fixing the amount of the capital stock and specifically state the corporate purposes. There is a further provision that it shall not be lawful for the corporation to "direct its operations or appropriate its funds to any other purpose"; Connecticut Statutes, Compilation of 1854, Chap. XIV, p. 226, § 198; and the powers of the corporation were thus largely those prescribed by the common law. The words "located

and established," in this chapter are used interchangeably. The law of 1852 which appears in § 218 at page 231, provides in detail how a change of location may be made from one town in this State, but makes no reference to the place where its plant is located. The procedure required indicates that the reference is to the corporate domicil. The word "located" which appears in the defendant's articles of association and "location" as used in our present statute have been definitely held to refer to the place "where the governing power of the corporation is exercised; where those meet in council who have a right to control its affairs . . . and not where the labor is performed in executing the requirements of the corporation in transacting its business." *Middletown Ferry Co.* v. *Middletown*, 40 Conn. 65, 70. We can find no sufficient sanction for the claim that the use in these articles of the words "located and established" was intended not only to fix the domicil but to impose an additional restriction by prescribing the *situs* of the physical plant. The words are almost if not quite synonymous and in view of the nature of the business to be carried on it cannot fairly be supposed that it was intended to restrict the operations of the company within territorial limits. While it may be competent to so limit the powers of a corporation by its charter, the articles of association or by statute, it would be unusual and contrary to any practice, so far as we are aware, in this State. To successfully accomplish such a result, it would be necessary to prescribe it in language specific and clear.

We conclude that neither the statute law nor the articles of this corporation restricted the manufacture or sale of this company's product to Bridgeport or to the State of Connecticut, and it follows that the making or selling of its product in whole or in part outside this State would be within its corporate powers,

as it would be at common law. "A corporation has the power, subject to charter or statutory restrictions and limitations, to act through its officers or other agents, in any other state or country, with its express or implied permission, by engaging in business, acquiring, holding, and conveying property, entering into contracts, and maintaining or defending actions, just as a natural person may"; 14 Corpus Juris, p. 342, § 421; and this common-law rule is affirmed in the existing statute law of this State. "Each corporation shall have power, subject to such provisions and limitations as may be contained in the charter or certificate of incorporation, or in any statute affecting it, to carry on business in any state or territory of the United States, or in any foreign country, if not prohibited by the laws of such State or territory or foreign country." General Statutes, § 3383.

It follows that manufacturing the company's product outside this State would not involve a fundamental change in the legal plan and scope of the corporate purpose and for that reason the question was one which did not require the assent of all the stockholders, but was merely incidental to, and in furtherance of, the legal conduct of the company's business as defined by its grant of corporate powers.

We find no charter or statutory requirement that the manufacturing plant of this company must be in the State of Connecticut. The requirement is not therefore a part of the compact under which the plaintiffs became stockholders and the only provisions in the Public Acts regarding a change of location, refer to the corporate domicil and not to the physical plant. This situation differentiates this case from those cited by the appellants: *McConnell* v. *Combination M. & M. Co.*, 30 Mont. 239, 76 Pac. 194; *Brown* v. *Electric Mining Machine Co.*, 22 Pittsburgh Legal Journal

(N.S.) 343; *Bernstein* v. *Katlin,* 150 Ala. 222, 43 So. 581; *Stickle* v. *Liberty Cycle Co.* (N. J.) 32 Atl. 708, and *Bank of Augusta* v. *Earle,* 38 U. S. (13 Pet.) 519. A reading of these cases discloses no conflict with the conclusion we have reached. They refer for the most part to removal of the corporate domicil or to locations of the physical plant which are fixed by statute or charter requirements.

But the appellants urge another aspect of the case as showing that manufacturing its products outside this State is a fundamental change in the scope and purpose of the company's business venture, or, as the brief states it, a material change in "the nature and purpose of the corporation or the undertaking or business venture for the prosecution of which it was created." Taking the conceded fact that the business has heretofore been conducted on the basis of a superior product for which a higher price was obtained than for other automobile springs in the market, they say that the present plan contemplates a fundamental change in the business in that the company's product would henceforth be of different quality and the company would be obliged to meet the competition of other manufacturers of the same product. It can hardly be denied that this is a marked change in policy of the company and it is not unlikely that much might be said to support a claim that such a change of policy without their assent was unwise, and perhaps unfair to minority stockholders; nevertheless the question remains strictly one of business policy which, speaking generally, it is the duty and right of a board of directors to formulate and direct. It is not, for the reasons already advanced, a fundamental change in the legal scope and purpose of the company's business as defined in the articles and statutes of this State. General Statutes, § 3461, upon which the appellants

rely, contains provisions for changes in the articles of association of corporations and prescribes that such changes in the name, nature or business and location must receive a vote of two thirds of the capital stock. The "nature of the business" is the manufacture and sale of automobile springs and accessories, and the resolution proposes no change in that. The change of "location" meant by the statute is such location as the articles of association prescribe. The articles in question fix only the location of the corporate domicil, and the resolution contemplates no change in that. This statute has no relevancy to our present question.

The third point urged by the appellants is that the carrying out of this resolution would result in exposing the assets of the company to danger of waste, and so justify the interposition of a court of equity by way of injunction analogous to the action for a receiver where assets are in danger of waste through attachment, litigation or otherwise. General Statutes, § 3467.

We may admit the analogy—at least to the extent that courts of equity have inherent authority to intervene by injunction or receivership to protect property rights where necessary under certain circumstances and where no adequate remedy at law is available—and both remedies rest in the sound discretion of the court. 32 Corpus Juris, p. 29. "It is now no longer doubted either in England or the United States, that courts of equity, in both, have a jurisdiction over corporations, at the instance of one or more of their members, to apply preventive remedies by injunctions to restrain those who administer them, from doing acts which would amount to a violation of charters or to prevent any misapplication of their capital or profits which might result in lessening the dividends of stockholders or the value of their shares, as either

may be protected by the franchises of a corporation, if the acts intended to be done create what is, in law, denominated a breach of trust; and the jurisdiction extends to inquire into and to enjoin, as the case may require that to be done, any proceedings by individuals in whatever character they may profess to act, if the subject of complaint is an imputed violation of a corporate franchise or the denial of a right growing out of it, for which there is no adequate remedy at law." *Dodge* v. *Woolsey*, 59 U. S. (18 How.) 331, 15 L. Ed. 401; *Pratt* v. *Pratt, Read & Co.*, 33 Conn. 446, 455; *Stevens* v. *Rutland & B. R. Co.*, 29 Vt. 545.

It became necessary for the present plaintiffs to show to the satisfaction of the court that the assets of the corporation would by the action contemplated be exposed to waste. The plaintiffs claimed and the defendants denied that this was true. It was thus an issuable question of fact.

The trial court found adversely to the plaintiffs' claim in this regard and refused injunctive interference. We may refer to the memorandum of decision for a better understanding of this finding. *Valluzzo* v. *Valluzzo*, 104 Conn. 152, 156, 132 Atl. 406; *Rowell* v. *Stamford Street Ry. Co.*, 64 Conn. 376, 380, 30 Atl. 131. Therein the court says the evidence showed that while the plan was to erect a plant in Buffalo, the business of the company was to go on as before—that it did not indicate that the business risk there was greater than in Stratford, but that freight charges and delays would be greatly lessened.

As we read the entire evidence, which is all before us for the purpose of correction of the finding, and consider the subordinate facts found together with such changes and additions as we could justifiably make, we cannot say that this conclusion did not have

a reasonable basis in fact. This being so, it was not an unreasonable or arbitrary exercise of discretion which led the trial court to refuse to intervene.

Careful consideration of the remaining assignments of error, shows none which, however decided, would change this result.

There is no error.

In this opinion the other judges concurred.