**PHOENIX SAVINGS AND LOAN, INC.**

v.

**The AETNA CASUALTY AND SURETY COMPANY.**

Civ. A. No. 15470.

United States District Court
D. Maryland.

March 6, 1969.

Clarence W. Sharp, Towson, Md., and Herbert H. Rosenbaum, Baltimore, Md., for plaintiff.

Elmer W. Beasley, Hartford, Conn., and William B. Kempton, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

NORTHROP, District Judge.

Phoenix Savings and Loan (Phoenix) brought this action against defendant Aetna Casualty & Surety Company (Aetna) seeking indemnity under savings and loans blanket discovery bonds for losses alleged to have been sustained by Phoenix through the dishonest and fraudulent acts of persons covered by the bond. Defendant Aetna, while contesting some of the losses, has primarily relied upon several, approximately ten, affirmative defenses. The case has proceeded to trial and at the close of the evidence defendant Aetna moved for a directed verdict. Based upon the evidence concerning the affirmative defenses of defendant, the court has decided to grant the motion for a directed verdict in favor of Aetna. Although the court rests its decision on the affirmative defenses of Aetna, a narration of the history of the litigation, claims of the parties and the proof of the plaintiff will be given to provide a more complete picture of the case.

This suit was originally filed in the state court and removed here by the de-

fendant, Aetna. Proceedings took place in this court which culminated in the granting of summary judgment in favor of Aetna. Upon review of this judgment by the United States Court of Appeals for the Fourth Circuit, that court was of the opinion that summary judgment was inappropriate and remanded the case for trial. The case was returned with this comment:

> In reversing we do not intimate any opinion as to the merits of the case. We are merely saying that we do not agree with the court below that summary judgment is a proper method to dispose of the complex issues of this controversy, inasmuch as there are disputes or controversies as to the historic facts and the inference to be drawn therefrom. There is an unresolved issue as to whether some of the frauds of Miller, an "employee" within the scope of the bond, were known to or participated in by the executive officers and/or directors of Phoenix. Further, there is a question as to whether the dishonest activities of Coven and Marshall were committed as "officers and employees" under the coverage of the bond, or as "directors" so as to exclude their acts from coverage of the bond. Further, *there is a sharp dispute between Phoenix and Aetna, which to our mind is unresolved, as to whether Coven, Marshall, Miller and possibly one or two others who are alleged to be in pari delicti in some of the frauds, had such control of Phoenix during all of the times such frauds were in process that their guilty knowledge was imputed to Phoenix as a matter of law. Upon a trial of the case the court below after hearing Phoenix' evidence will be in a much better position to determine whether the trial should proceed further, or whether a verdict should be directed in favor of Aetna.* [emphasis added] Phoenix Savings & Loan Inc. v. Aetna Casualty & Surety Co., 381 F.2d 245 at 251, 252 (1967).

In preparation for trial, investigations, discovery, and discussions were engaged in by counsel resulting in two pretrial conferences. From these conferences a pretrial order was produced containing, among other things, 194 stipulations of fact and 44 admitted documents which were stipulated to be in evidence. With these preparations complete the case proceeded to trial.

When the case was filed Phoenix presented approximately 14 claims for adjudication. But, here before the court, counsel for Phoenix has had to, in candor, abandon all but two claims. Frankly, the court, counsel for Aetna, and I daresay, counsel for Phoenix, did not suspect until a very short time before trial that the claims and the evidence would be so limited. However, the 194 stipulations and the 44 documents, the testimony of Mr. Carlton J. Swayne, an accounting expert whose testimony in many respects merely corroborated the stipulations and other exhibits, constituted the entire factual testimony in the case. The two non-abandoned claims cover certain stock transactions at a price below that authorized by the Phoenix bylaws and certain mortgage transactions covering non-existent home-improvement loans. Phoenix claims these losses were caused by Saul Marshall (Marshall), Bernard Coven (Coven), and Albert Miller (Miller). Coven and Marshall were members of the Phoenix board of directors and its executive committee during the entire life of the corporation; Coven was executive director from January 21, 1960, to June 23, 1961 (¶ 90, p. 25A Pretrial Order (PTO)). Both served in other offices of the corporation (¶ 91, p. 25A PTO). Miller served as "mortgage representative" of Phoenix and in that position participated in all loan transactions (¶¶ 36–39, pp. 15–16 PTO).

From the pretrial stipulation and Swayne, testimony was introduced concerning four improper stock sales. Swayne, now the president of the reorganized Phoenix, is an accounting expert, having studied at Johns Hopkins University and practiced in that field for ten years. These sales were to Great Eastern Mortgage Corporation (Great

Eastern) which was owned by Coven and Marshall, Mortgage Surplus Fund, Inc. (MFS), Interstate Appraisal, Inc. (Interstate), and KWT–KDN, Inc., all of which were owned and controlled by Albert and Betty Miller. These sales took place between December 5, 1960, and March 17, 1961. There is dispute over the effective date of the Interstate transaction, but for the purposes of this opinion the court accepts the Phoenix date of December 21, 1960.

Now there were two bonds during the period in question in this suit, each exactly identical in their terms. The first bond was in effect from December 1, 1959, until December 1, 1960 (¶ 29, p. 13 PTO) and the second bond was in effect from December 1, 1960, until December 1, 1961 (¶ 66, p. 20 PTO).

The Great Eastern transaction concerned the exchange on the books of Phoenix of B stock for A stock. The B stock had been purchased by Great Eastern for one dollar a share, while the A stock, by the provision of the bylaws could not be sold for less than three dollars a share.

The stock entries show that the B stock had been exchanged by Great Eastern for an equal amount of A stock without the necessary additional capital being paid, causing a loss to Phoenix of $116,-784. This transaction occurred on December 5, 1960, and was handled by Coven and Marshall (¶¶ 104, 105, p. 28 PTO). According to the testimony of Swayne, the entries and records of Phoenix, which were directed to be made by Marshall, clearly reflected that B stock which had been purchased at one dollar a share was exchanged for an equal amount of A stock at one dollar a share when the bylaws required the sale of the stock for three dollars per share.

Swayne further testified that there was a sale of 5,000 shares of Class A stock to Interstate, an Albert Miller corporation, for $5,000 occasioning a loss of $10,000. This testimony was in complete accord with the stipulation of facts (¶¶ 99, 100, p. 27 PTO). A check for $5,000,

drawn by Miller, president, on November 23, 1960, was deposited to Phoenix's account on December 21, 1960, and the entries were made on the Phoenix books as of that date. Again these transactions, as testified by Swayne, were clearly reflected on the records of Phoenix.

As to the third improper stock transaction, the stipulation of facts (¶ 112, p. 89 PTO), showed and Swayne testified that MSF, another Miller corporation, purchased 1,000 shares of Phoenix A stock for $1,000, constituting a $2,000 loss since only one dollar a share was paid instead of the minimum three dollars a share. The records of Phoenix show that the shares were purchased on February 20, 1961, and a credit of $1,000 was made on the company stock books. Swayne again testified that the books and records of Phoenix clearly reflect this transaction.

The last claimed stock transaction refers to yet a third Miller corporation, KWT–KDN, Inc. (pronounced "quit-kiddin"). The stipulation relates and Swayne testified that 26,000 shares of Phoenix A stock were purchased for $31,-000 whereas a price of $78,000 should have been paid for this stock, causing a claimed loss of $47,000 (¶¶ 113, 116, pp. 29–30 PTO). Again the entries on Phoenix's books and records clearly reflect this transaction.

Summarizing, the Great Eastern stock matter was perpetrated by Coven and Marshall and the stock sales to Interstate, MSF and KWT-KDN were participated in by Miller with the knowledge of Coven and Marshall, since they handled all stock transactions for Phoenix (¶ 119, p. 30 PTO).

It was stipulated in court that there was a market for Phoenix A stock from December of 1960 to March of 1961 at a price of at least three dollars per share. This concluded the evidence concerning the claimed fraudulent stock transactions.

Next, Swayne testified to the Royal Stewart Company (Royal) transactions listed in paragraph nine of the complaint.

This claim encompasses four separate mortgage transactions which it is alleged caused a total loss of $10,209.00. These mortgages supposedly had been bought by Royal from a building contractor who had done the work. Swayne testified and records were offered to show that Phoenix had purchased these home-improvement mortgages from Royal, a Miller corporation, had paid Royal for them, but Royal, according to the mortgage record files had no ownership interest in these mortgages. Swayne further testified that the listed borrowers had never heard of Phoenix, Royal or the contractors and had never borrowed the money in question. These transactions took place between March and May of 1961. Miller as loan officer handled the transactions, but the book entries which clearly reflect the transactions were handled by Marshall. This concluded the affirmative evidence concerning proof of loss.

Aetna contested the Phoenix claims and on cross-examination of Swayne elicited from him that Phoenix had bought other mortgages from Royal for work done by these contractors and that these mortgages were valid. (Some of these were uncollectible by reason of foreclosure on a prior mortgage; others were still being carried on the books of Phoenix.) Swayne also admitted under cross-examination that if the work was done by the contractor, it could be inferred that he, the contractor, would not endorse the loan papers without being paid by someone. However, Swayne was adamant that the claimed mortgage files were not of that nature in that the listed borrowers claimed that the work was never done, the money was never loaned, and, indeed, the principal corporations including the contractors were unknown to them.

It should also be mentioned that Aetna contested whether certain transactions caused out-of-pocket losses because some of the money which Miller illicitly gained was never removed from Phoenix. According to Aetna, Miller placed this money in private accounts he had with Phoenix, but never had the opportunity to withdraw the money from the accounts before Phoenix went bankrupt and closed its doors.

As previously mentioned, while Aetna does offer some rebuttal to the claimed losses, it primarily defends against the Phoenix claim by asserting ten affirmative defenses. These affirmative defenses are based upon conditions and exclusions contained in the insurance bond.

■ These bonds are contracts and, like all contracts, the conditions in them must be met in order for them to be effective. Since several of the conditions in this contract are important to the determination of this case, the court before proceeding further will detail the conditions and explain their importance.

The bond is intended to cover the acts of employees and defines employee to mean "any officer or employee of the Insured." However, the bond does not intend to cover the acts of directors as manifest by Exclusion Section 2c which excludes from the bond's coverage:

> Any loss resulting wholly or partly from the wrongful act or default of any of the directors or trustees of the Insured who are not employed by the Insured at a salary, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general directorial acts on behalf of the Insured.

■■ It should be noted that under the law of Maryland directors may act as employees. Wharton v. Fidelity-Baltimore National Bank, 222 Md. 177, 158 A.2d 887 (1960). Thus, this defense raised the question of whether Coven and Marshall admittedly directors and members of the executive committee, were acting as employees when they participated in the claimed transactions. Miller

was an employee without question, but other affirmative defenses are pertinent to him.

Section 3 of the bond provides:

At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Underwriter nor after the expiration of twenty-four months from the discovery of such loss . . ..

It has been held that the word "loss" in this clause means the date the fraud was discovered by the bank. Mount Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co., 224 F. Supp. 666 (D.C. Va. 1963). This clause raised the question of when Phoenix discovered the defalcations alleged. It is admitted that Phoenix did not give a notice of the claimed losses until July 17, 1961, after it was taken over by the conservator (¶ 187, p. 40 PTO). Two additional conditions of a similar vein are embodied in this section of the bond. These clauses are conditions precedent to recovery and if the losses were known to Phoenix substantially prior to the conservatorship, their terms would prevent recovery on the bond.

The second paragraph of Section 10 provides:

This bond shall terminate as to any Employee . . . *immediately upon discovery* by the Insured of any dishonest or fraudulent act on the part of such Employee. [Emphasis supplied]

It is plain that under this clause, the question of Phoenix's knowledge of the acts of its employees is crucial.

The last clause and perhaps the most important is contained in Phoenix's application for the bonds. It reads:

The present officers, attorneys and employees (and also agents and conveyancers, if any, to be covered under Standard Form No. 22), of the Insured have all to the best of the Insured's knowledge and belief, while in the service of the Insured always performed their respective duties faithfully. Such knowledge as any officer signing for the Insured may now have in respect to his own personal acts or conduct, unknown to the Insured, is not imputable to the Insured.

This statement calls into question the knowledge of Phoenix at the time it applied for the bonds. The first bond application was signed by George Gratum, then president of Phoenix. That bond was in effect from December 1, 1959, to December 1, 1960 (¶¶ 29, 30, p. 13 PTO). The second bond application was signed by Saul Marshall, as secretary. That bond was effective from December 1, 1960, to December 1, 1961 (¶¶ 66–68, pp. 20–21 PTO).

Aetna claims that control of Phoenix resided in its board of directors and that control was exercised by the executive committee which was completely dominated by Coven and Marshall during the times these transactions took place. In addition Aetna claims that since the Phoenix board of directors "approved, adopted and ratified" all of the claimed transactions, they must be charged with knowledge of and full responsibility for them. Moreover, since the details of the transactions were reflected on the books and records of the corporation all of those in authority were chargeable with knowledge of the transactions. Aetna, thus, urges the Insured, i. e. Phoenix, knew of these losses long before the conservatorship causing all of the above-mentioned clauses to operate in terminating or nullifying the bond.

Phoenix claims, on the other hand, that Marshall and Coven were acting as employees of Phoenix and were, therefore, covered by the bond and the losses which they and Miller caused were hidden from the corporation in that the

stockholders who were the ones that held ultimate control of the company knew nothing of the defalcations.

In connection with this matter Phoenix has introduced evidence that 54% of the A stock was owned by the general public. There is also a question of "control stock." Under the charter and bylaws of Phoenix, 75% of the B stockholders had to approve of any stockholder transaction. Aetna, while not affirmatively rebutting this evidence, questions the suffficiency of it. Since this matter is collateral to the main thrust of this decision it will not be detailed, but suffice to say that Aetna pointed out that no up-to-date stock ledger of all Phoenix stockholders exists and the records available were not fully complete.

■■ The key to the affirmative defenses raised by Aetna is the question of control and, ultimately, knowledge of the corporation. I find that there is no dispute as to the operative facts concerning control and knowledge and that these facts are already found and determined by the stipulation. Reasonable men could not differ in reference to these facts or any inferences which could be drawn from them; they are not disputed, as it was once thought they might be. Indeed, as evidenced by the voluminous stipulation there has been little factual dispute as to any matter. Applying the law of Maryland, as required in a diversity case, to these facts, I find that a directed verdict must be issued in favor of Aetna. Phoenix contends that the jury could find that the stockholders controlled the corporation. However, neither the law nor the facts support this contention. It is the settled law in Maryland and the general corporate law of this country that control of a corporation and its activities is vested in the corporation's board of directors. Warren v. Fitzgerald, 189 Md. 476, 56 A.2d 827 (1947); Carter v. Spring Perch Co., 113 Conn. 636, 155 A. 832 (1931). See also 2 Fletcher Cyclopedia of Corporations § 505. The charter of Phoenix, its constitution, if you will, places the control of the corporation in the board of directors. The charter reads:

> The Board of Directors shall have the general management and control of the business and property of the Corporation and may exercise all the powers of the Corporation except such as may be expressly limited by statute, charter or by-laws to the stockholders. Without limiting the generality of the foregoing powers and subject to and unless prohibited by the statutes of the State of Maryland, the Board of Directors without the consent or other action of the stockholders of the Corporation may authorize the Corporation to purchase, sell or otherwise acquire or * * * dispose of, such property * * * as the Board of Directors may from time to time determine, and in payment for any property or for money or other consideration * * * to issue or cause to be issued stock of the Corporation * * *. (¶ 9, p. 4 PTO) [Emphasis supplied]

One stockholders' meeting was called. That meeting was held September 1, 1960. Six stockholders were present: Sutton, Fields, Marshall, Coven, Mandel, and Horowitz. The only recorded action of that meeting is:

> On motion made and carried it was Resolved that the present Board of Directors of the Association be continued for a further term to expire September 1st, 1961 and that the Board of Directors be and it hereby is authorized to fill such present or future vacancies in the Board of Directors of the Association without further action by the stockholders of the Association. (¶ 74, p. 22 PTO, ¶ 54, p. 18 PTO)

The stockholders never appointed or elected a director (¶ 78, p. 22 PTO), never approved or participated in any act or transaction of the corporation (¶ 92, p. 25A PTO).

For the purposes of this opinion this court will assume that majority owner-

ship of Phoenix stock was in the general public and not in Coven, Marshall, Miller, their corporations or their coterie. The court will also treat A and B stock as equals. And, since these matters are not crucial in the view the court takes of the case, extensive findings will not be made in this area. However, especial attention must be given to the powers and the holders of the Phoenix B stock.

By charter, 75% of the B stockholders must approve of any stockholder action before it is binding. Yet, while the B stockholders could "veto" acts without the votes of the A stockholders they could not take any affirmative action. The holders of B stock were a closed group never numbering more than 14 (¶ 73, p. 22 PTO) and during the period at issue numbering 10. At least 5 of these were malefactors or cohorts of malefactors, Coven, Marshall, Miller, Betty Miller, and Interstate (Exhibit A, Supp., p. 85, Joint Exhibit). The others have documented connection with the malefactors to make the cleanliness of their hands suspect (¶¶ 82–88, pp. 23–25 PTO).

While the charter originally vested control in the board of directors, the board relinquished most, if not all of that control to the executive committee. At a meeting of the board on September 15, 1959, with Coven, Marshall, and Gratum present, the board resolved that:

(a) RESOLVED, that an Executive Committee of the Board of Directors be elected and the following persons shall and hereby are constituted the said Executive Committee of the Board of Directors of the Association:

BERNARD J. COVEN
SAUL MARSHALL

(b) RESOLVED, that the said Executive Committee shall during the interim between the full board meetings of the Board of Directors possess and have and exercise all of the powers of the full Board of Directors and their acts shall be done in the name of the Board of Directors of the Association. (¶ 14, p. 10 PTO)

Thus, between board meetings, the executive committee under the charter and board resolutions controlled the corporation.

It is stipulated that three meetings of the Phoenix board of directors were held after the appointment of the executive committee (¶ 75, p. 23 PTO). The first meeting was held on January 26, 1960. Messrs. Coven, Beiles, Marshall, Decker, Robert Goelet, Jr., Matty Simmons, Mogel, Horowitz, Fisher, Yassky, Schenck, Tasch, Sutton, Mandel, Dockrell, Waters, and Mac Fields were present. Four directors were reported as absent. At this meeting the following resolution was passed:

On motion duly made, seconded and unanimously carried all actions on the part of the officers and Executive Committee of the Association were, to the date of said meeting, approved, adopted and ratified. (¶ 28, pp. 12–13 PTO).

The next meeting was held on December 8, 1960. Present were Messrs. Sutton, Gratum, Beiles, Fields, Coven, Schenck, Marshall, Horowitz, Mandel, Keller, Lesser, Croft, and Dockrell with no directors recorded absent. At that time the board passed the following resolution:

(g) Resolved that the acts of the officers of the Association and the Executive Committee of the Association be and the same hereby is confirmed, ratified, approved and adopted. (¶ 59, p. 19, 20 PTO)

At the final meeting, a similar resolution approving, adopting and ratifying all actions taken by the executive committee was adopted (¶ 70, p. 21 PTO). The record and stipulations speak for themselves that at these four meetings very little transpired except the adopting, approval and ratification of all actions taken by the executive committee. Included in these "approved, ratified and adopted" acts were all of the irregularities complained of here.

The activities of Marshall and Coven, as unfurled in the stipulations of fact, reveal with certainty that Coven and Marshall had complete control over corporate activities. Coven and Marshall elected themselves the chief executive officers of Phoenix (¶ 90, p. 25A PTO). Coven and Marshall ran the day-to-day operation of Phoenix (¶ 119, p. 30, ¶ 194, p. 41 PTO). Coven and Marshall comprised the "alter ego" of the board, the executive committee (¶ 91, p. 25A, PTO) (joined by Fields and Sutton in April of 1960). All executive decisions involved in these transactions (including those parts of the complaint which have been abandoned) were participated in by Coven and Marshall (¶¶ 89–94, pp. 25A–26, ¶ 193, p. 41 PTO). Coven and Marshall handled all stock transactions upon the books of Phoenix (¶ 194, p. 41 PTO). In contradistinction, no evidence has been introduced showing any affirmative acts being initiated or carried out by the other members of the board. Many of them never attended a meeting. The court finds this case in the exact posture of Hartford Indemnity Co. v. Harley, Receiver.

At first blush it may seem that under the provisions of the application the knowledge of the misappropriations would not be imputed to the first because of the application provision: 'Such knowledge as any officer signing for the Insured may now have in respect to his own personal acts or conduct, unknown to the Insured, is not imputable to the Insured bank.' * * *

It is true in our case we are dealing with a partnership and not a corporation, but the reasoning and logic behind the holding may very well apply to both situations. * * * A fortiori, this is so where, as here, there is only one active partner and he has sole and complete management of the operations of the firm. If the dishonesty had consisted of a single act or if all of the partners had been active in the management the argument that the knowledge should not be imputed to the firm may have had some validity. But *here it is an undisputed fact that Mr. Thompson had sole and complete control of the operations of the bank and that he also had full knowledge of all of the misappropriations of the funds of the bank, being himself the perpetrator thereof. Therefore, it must be held that his knowledge was the firm's knowledge and this notwithstanding the above quoted provision in the application.* Whatever might have been the effect of said provision had there been a number of active partners and had the misconduct of Mr. Thompson been known only to himself, said provision cannot protect the bank here because in the words of the provision the misconduct was not 'unknown to the insured.' *It was abundantly known to the partnership bank because it was perpetrated by the firm's only active managing partner—its alter ego.* [Emphasis supplied] Hartford Accident & Indemnity Co. v. Hartley, 275 F. Supp. 610, 617, 618 (D.Ga.1967) aff'd without opinion, 389 F.2d 91 (5th Cir. 1968).

There, as here, the malefactors were the only active participants in management. There, as here, a history of misappropriations was present. There, as here, the facts were undisputed. While that court in that case was concerned only with one clause of the insurance contract, its principle is applicable to all of the clauses in dispute here. Where corporate control has been abdicated by those charged with exercising such control and all corporate power is exercised by a few who perform misdeeds, knowledge of these misdeeds must be imputed to the corporation. Phoenix, therefore, knew of the defalcations as they occurred. Thus, ladened with the knowledge of the misdeeds, Phoenix failed to give the notice of loss as required by the bond and, of course, did not heed the filing limits as to proof of loss and bringing suit. In addition, the

bond terminated as to Miller upon the first of his misappropriations since knowledge of that transaction must have been known to Coven and Marshall, who were in complete control of the stock matters of Phoenix (¶ 119, 120, p. 30, 31 PTO).

Lastly, the same termination provision that was applicable in *Harley* is applicable here. Marshall signed the application for the second bond on December 13, 1960. While the effect of the application and the subsequent bond was postdated to December 1, 1960 (¶¶ 66–68, p. 20, 21 PTO), the insured's disclaimer of knowledge was effective on December 13. Because he and Coven were the sole corporate actors of Phoenix, his knowledge at that time of his misdeeds as well as the misdeeds of Coven and Miller was the knowledge of the insured, Phoenix. Any defalcations or losses which could be attributed to the first bond, which was signed by Gratum, while not voided by this particular provision, were subject to all of the other provisions since they were known to the two corporate actors of Phoenix, Coven and Marshall.

Aside from the termination provisions, the bond never covered the acts of Coven and Marshall since they, in these surroundings, never acted as employees. While they did perform a good deal of the ministerial tasks and directed all of the day-to-day activities, they also were establishing and carrying out corporate policy at the same time. In their role as executive committee, unchecked by the board of directors, they were permitted to act with complete freedom. A person in corporate authority who is responsible only to himself cannot be likened to an employee under the direct supervision of management and corporate authority.

In addition, all members of the board accepted full knowledge and responsibility for the acts of defalcations when in their official capacity they rubber-stamped the acts of Coven and Marshall. And the board was charged with knowledge of these acts which were plainly visible on the books and records of Phoenix (¶ 192, p. 41, ¶ 121, p. 31 PTO).

Lastly, even if the plaintiff's general theory were to be accepted, the court is of the opinion that under these facts control of the shareholders resided in Coven and Marshall. Taking the plaintiff's evidence *at its best*, at least 5B shareholders, Coven, Marshall, Miller, his wife, Betty Miller, and Interstate, a Miller corporation, were malefactors, enough to defeat any affirmative stockholder action (Ex. A. Supp., p. 87, Joint Exhibit). In fact, all but one of the B stockholders is in some way connected with Coven and Marshall and Phoenix and a jury could easily draw the inference that all were implicated in its scheme, e. g., Fields, Sutton, Horowitz, Mandel and Fisher were all B shareholders and all shareholders in Great Eastern, which itself was a B shareholder. (For a more complete list of the intertwining activities of B shareholders and other directors, see ¶¶ 82–88, pp. 23–25 PTO). About 43% of the Phoenix A stock was controlled by the malefactors or their coterie. Control of the shareholders need not be by absolute majority ownership of the stock. As a practical reality an owner of 25% diversely-owned stock can easily maintain "working" control of the shareholders. Here, the malefactors owned approximately 43% of the publicly-owned A common stock, controlled at least 5 of the closely-held B stock votes and were in a position to vote any proxies which could be garnered.

In conclusion, viewing the 194 stipulations of fact and 44 exhibits which are in evidence, the testimony of Swayne and the exhibits which were introduced through his testimony, it is certain that the facts which they present are clear and unrefuted. No reasonable man could find in them or infer from them that Coven and Marshall were not the alter ego and dominant force in Phoenix Savings and Loan Association, and that Mil-

ler's conduct was well known to the corporation at all times. I, therefore, direct a verdict in favor of Aetna Casualty and Surety Company.