**PHOENIX SAVINGS AND LOAN, INC.,**
Appellant,

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellee.**

**No. 13551.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 7, 1969.

Decided June 8, 1970.

Clarence W. Sharp, Herbert H. Rosenbaum, Baltimore, Md., for appellant.

William B. Kempton, Baltimore, Md., Elmer W. Beasley, Hartford, Conn., for appellee.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

Phoenix Savings and Loan, Inc., successor to Phoenix Savings and Loan Association, Inc., brought this action against the Aetna Casualty and Surety Company in the Superior Court of Baltimore City, Maryland, seeking indemnity under a Savings and Loan Blanket Bond, Standard Form No. 22, revised to September 1960, for alleged losses sustained by Phoenix through the defalcations of its officers, employees, and directors. Aetna removed the suit to the United States District Court for the District of Maryland based upon diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332. In the district court, Aetna denied the existence of the alleged losses and asserted a number of affirmative defenses. On July 6, 1966, the district court granted Aetna's motion for summary judgment. On appeal, this court reversed and remanded the case for trial. Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 381 F.2d 245 (4th Cir. 1967). Following extensive pretrial proceedings, the parties agreed to a pretrial order containing 194 paragraphs of fact stipulations as well as a stipulation as to the authenticity of 44 documentary exhibits. At trial, these stipulations and documents were presented to the jury and testimony regarding certain corporate records was elicited from the current president of Phoenix. No other evidence was introduced. At the close of all the evidence, the district court directed a verdict in favor of Aetna. Phoenix appeals and, again, we reverse.

The original Phoenix was incorporated under the laws of Maryland on December 29, 1958, and conducted business in the vicinity of Baltimore, Maryland, until, on July 17, 1961, it was placed in the hands of a conservator by the Circuit Court of Baltimore City. A court-ordered audit at that time revealed a $142,839.86 net capital deficiency. During the entire life of the original Phoenix, Bernard Jay Coven and Saul Marshall were active in management and control of the corporation. Coven served from time to time as president, executive director, director, chairman of the board of directors, member of the executive committee and attorney. Marshall served variously as secretary, assistant secretary, treasurer, comptroller, auditor, member of the executive committee and director. Albert Miller, who was never an officer or director, served as agent, conveyancer, and mortgage representative. Phoenix attributes its losses to the activities of Coven, Marshall, and Miller as primary malefactors. Aetna, however, asserts that other directors also had knowledge of their fraudulent activities.[1]

Phoenix has, at this point in the litigation, abandoned all except two of the 14 claims[2] that it initially alleged. One claim is based upon losses resulting from four improper stock sales.[3] Each sale involved the issuance of Phoenix stock to another corporation in consideration of value less than that authorized by Phoenix' board of directors. One sale was to Great Eastern Corporation, which was owned and controlled by Coven and Marshall in conjunction with certain other Phoenix directors. The other sales were to Mortgage Surplus Fund, Inc., Interstate Appraisal, Inc., and KWT-KDN, Inc., which were owned and controlled by Albert Miller and his wife. The parties have stipulated that Coven and Marshall handled all such stock transactions.

The second claim is based upon losses sustained by Phoenix in transactions[4]

---

1. None of the alleged evildoers have any interest in the reorganized Phoenix Savings and Loan, Inc., and will not benefit from any recovery that may be obtained by Phoenix.

2. The *ad damnum* of the total claims asserted amounted to some $630,000. The two claims remaining in litigation amount to some $126,300. The coverage of each bond in issue is limited to $100,000.

3. These stock transactions took place between December 5, 1960, and March 17, 1961.

4. These transactions took place during March, April, and May 1961.

with the Royal Stewart Company, owned and controlled by Miller. Miller, as loan officer, purchased four bogus home improvement mortgages from Royal Stewart Company on behalf of Phoenix. It is stipulated that Phoenix' books clearly reflect all of these fraudulent transactions. While Aetna did contend below that some of these dealings resulted in no real loss to Phoenix, it does not raise that issue on appeal.

There were two successive identical Aetna fidelity blanket bonds in effect when the defalcations took place. The first bond covered the period December 1, 1959, through December 1, 1960, and the second covered the period December 1, 1960, through December 1, 1961. Both bonds were "discovery bonds" binding Aetna to indemnify Phoenix against certain losses [5] sustained at any time, but discovered during the term of the bond. Both bonds contained certain definition, exclusion, notice, and termination clauses [6] upon which Aetna bases its affirmative defenses.[7] The parties

5. The insuring agreement in the bonds provides, in pertinent part:

The Underwriter * * * agrees * * * to indemnify and hold harmless the Insured for:

(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees, of Property held by the insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the insured is legally liable therefor.

6. DEFINITIONS

Section 1. The following terms, as used in this bond, shall have the respective meanings stated in this Section:

(a) "Employee" means:

(1) any officer or employee of the Insured;

(2) any employee of an executive officer of the Insured;

(3) any duly elected or appointed attorney of the Insured or any employee of such attorney;

(4) any natural person (sometimes known as conveyancer) duly elected or appointed by the Insured to draw deeds of conveyances of lands, to investigate titles of real property or otherwise to assist the Insured in the making (as distinguished from the servicing or collection) of mortgage loans, while performing such services;

EXCLUSIONS

Section 2. This Bond Does Not Cover:

(c) Any loss resulting wholly or partly from the wrongful act or default of any of the directors or trustees of the Insured who are not employed by the Insured at a salary, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured.

LOSS-NOTICE-PROOF-LEGAL PROCEEDINGS

Section 3. At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Underwriter nor after the expiration of twenty-four months from the discovery of such loss * * *.

TERMINATION

This bond shall terminate as to any Employee—(a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Employee, without prejudice to the loss of any Property then in transit in the custody of such Employee, or (b) fifteen days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate this bond as to such Employee.

7. The affirmative defenses pleaded in the answer were (a) the alleged wrongdoers (except Albert Miller) were not employees of Phoenix whose acts were covered by the bonds, but they committed the wrongful acts and conducted the wrongful transactions in their capacities as directors and any losses resulting therefrom are specifically excluded from coverage of the bond; (b) most of the wrongful acts had occurred at the times when Phoenix applied for, and obtained, the execution and delivery of the successive bonds, and Phoenix concealed from defendant all such acts and transactions,

agree that no notice of loss was given to Aetna prior to the conservatorship.

There is some uncertainty regarding the locus of ownership and control of Phoenix stock during 1958 through 1961. The stock transfer books of the corporation were incomplete. J. Carlton Swain, now president of Phoenix, testified that 54 percent of all the voting stock [8] was owned by the public and was traded over the counter. Aetna contends, with complex computations based on the documentary evidence, that Coven, Marshall, and other malefactors owned more than 50 percent of the voting stock. The district court assumed, *arguendo*, that the public owned 54 percent. Coven, Marshall, and Miller may have controlled enough Class B stock to block any affirmative stockholder action since under the corporate charter any such action required the vote of 75 percent of the Class B stockholders.

Phoenix' corporate charter vests in the board of directors "the general management and control of the business and property of the Corporation and * * *

all the powers of the Corporation" not reserved to the stockholders. No powers were expressly reserved to the stockholders. The corporate bylaws provided for an executive committee to be elected by the board of directors and to exercise all the powers of the board between board meetings. The bylaws further provided for an executive director to be appointed by the board of directors to "have charge of and manage the affairs [of the corporation] and make such reports thereon to the Board of Directors as it may from time to time require."

On September 15, 1959, the board of directors constituted Coven and Marshall as the executive committee. On January 21, 1960, the executive committee (Coven and Marshall) appointed Coven executive director. On April 28, 1960, and on May 26, 1960, X. F. Sutton and Mac Fields respectively were added to the executive committee. All of the directors of Phoenix were selected by the board of directors or by the executive committee acting for the board. A total of 40 different persons served as directors during the period 1958 through the

---

and such concealment rendered both bonds unenforcible *against defendant*; (c) the discovery of the various alleged wrongful acts and transactions when they occurred, and the termination of the bonds as to those persons who were employees upon discovery of the first of such acts and transactions; (d) failure to give notice to defendant of the alleged losses and to furnish defendant affirmative proof of loss, with full particulars, within the times specified in the bonds as conditions precedent to recovery; (e) the alleged wrongful acts and transactions were carried out in the name of Phoenix in the exercise of authorized corporate functions, and Phoenix became a party to the fraud, and there is no bond coverage for the insured's own fraudulent acts; (f) the ratification by Phoenix of all of the condemned transactions by claiming the fruits of those transactions, thereby precluding any recovery from defendant; (g) estoppel from claiming in this action against defendant that Phoenix has sustained any losses through the alleged wrongful acts and transactions which are covered by de-

fendant's bonds; (h) the exclusion of all losses allegedly suffered *as a result* of the various loan transactions described in the complaint from the coverage of the bonds; and (i) the charter released the officers and directors from any liability for any losses which Phoenix might sustain through the various transactions alleged in the complaint, thereby precluding any recovery from defendant for those losses.

Those affirmative defenses which Aetna urges upon us in this appeal are discussed, *infra*.

8. The corporate charter provided for the issuance of three classes of common stock: 367,000 shares of Class A, 36,000 shares of Class B, and 400 shares of Class C were issued. Each share of Class A and B had one vote, and the Class C stockholders each had one vote. Class A and Class B shares, each having one vote, were identical, except that no corporate act requiring stockholder approval was valid "unless concurred in by not less than 75 percent of the holders of Class B common stock."

beginning of the conservatorship.[9] After creation of the executive committee, there were only three. meetings of the board of directors held. On January 26, 1960, 18 members of the board were present and action was taken ratifying all acts of the officers and executive committee. On December 8, 1960, 13 members were present and action was taken continuing the executive committee in office and ratifying its prior acts. On April 19, 1961, the entire board, consisting of 11 members, was present and all prior acts of the officers and executive committee were approved. The minutes of the board meetings during the entire life of the original Phoenix show only Coven and Marshall making reports of corporate activities to the board. Coven and Marshall, who held various offices as noted above, conducted most of the day-to-day business of the corporation and controlled its account books. Coven appointed Albert Miller to be Phoenix' mortgage representative on March 18, 1960. Miller was under the direct supervision of Coven and Marshall during his entire tenure with Phoenix.

The original Phoenix carried on substantial business dealings with corporations owned and controlled by Coven, Marshall, and other Phoenix directors. This was possible because Coven and Marshall, as executive committee, caused the corporate charter to be amended to allow transactions between Phoenix and its directors. Coven, Marshall, Fields, Sutton and six other directors were associates in various business ventures in addition to their association in the Phoenix organization.

There is no dispute between Phoenix and Aetna as to the operative facts, all of which have been determined by stipulation. Aetna contends, and the district court so held, that the undisputed facts establish conclusively, as a matter of law, Aetna's affirmative defenses. Those affirmative defenses rest on the premise that Phoenix was the mere "alter ego" of Coven and Marshall and that the malefactors had such complete control of the corporation as to require imputation to the corporation of all that they knew about the illicit transactions as those transactions occurred. Aetna further asserts, and the district court held, that Coven and Marshall never acted within the terms of the bond as "employees" of Phoenix but rather, because of their control of the corporation, only acted as directors. Aetna's position is that all directorial acts were specifically excluded from the bond's coverage. Because knowledge of the condemned transactions is thus imputable to Phoenix, Aetna rea-

9. The officers and directors of Phoenix at various times prior to reorganization were:

President: Bernard J. Coven, George Gratum, Xavier F. Sutton, Donald F. Smith.

Vice President: Harry Beiles, George Gratum, Jerry Gale, Harold Brown, Arthur J. Decker, Jr. (Assistant).

Secretary: Saul Marshall, Harry V. George.

Assistant Secretary: Boris Mlawer, Saul Marshall, Margaret Pearson, Ann Longan, Evelyn Worsham, Julia George.

Treasurer: Saul Marshall, Mac Fields.

Comptroller: Saul Marshall.

Auditor: Saul Marshall.

Executive Committee: Bernard J. Coven, Saul Marshall, Xavier F. Sutton, Mac Fields, Dr. Howell A. King, Morris Brown, Harold Brown.

Directors: Bernard J. Coven, Michael Infante, Martin Lesser, Leon Henderson, Leo Yaskey, Herman Keller, Harry Beiles, Burton D. Fisher, Howell A. King, Saul Marshall, Stanley A. Schenck, Burton M. Gross, Harry George, Edwin Tasch, Marshall R. Diggs, Benjamin Horowitz, Boris Mlawer, S. Christian Brenneman, George Gratum, Xavier F. Sutton, Gordon H. Burlingname, Arthur J. Decker, Jr., Mac Fields, Harold Brown, Harold Brooks Mandel, Arthur Waters, Sidney London, Robert Goulet, Jr., Brig. Gen. Sam E. Dockrell, Morris Brown, Matty Simmons, Arthur C. Croft, Theodore Cohn, Leonard Mogel, Theodore R. McKeldin, Dr. Manuel Levin, Harold C. Fields, Jerry L. Gale, Robert J. Dixson, Charles Culver.

Counsel: Bernard J. Coven, Theodore McKeldin, Charles Harris, John W. Cable, III, Marvin Schein, Saul McGrane, Albert G. Aaron, James Murphy, William J. O'Donnell.

sons, the bonds terminated as to each employee upon his first fraudulent act; Phoenix' failure to divulge prior fraud in its second bond application rendered that bond void *ab initio*; and Phoenix' failure to give Aetna notice, proof of loss, etc., after imputed discovery and within the bond's time limits bars recovery.

The district court based its decision to enter a directed verdict for Aetna upon Aetna's affirmative defenses and held that "[n]o reasonable man could find in [the undisputed facts] or infer from them that Coven and Marshall were not the alter ego and dominant force in Phoenix Savings and Loan Association, and that Miller's conduct was [sic] [not?] well known to the corporation at all times." Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., 302 F. Supp. 832, 841 (D.Md.1969). We disagree.

■ In determining the propriety of a directed verdict, the reviewing court must "view the evidence and inferences most favorably to the party against whom the motion is made." 2B Barron and Holtzoff, Federal Practice and Procedure (Wright ed.) § 1075. Grombach v. Oerlikon Tool and Arms Corp., 276 F.2d 155 (4th Cir. 1960); Nicholson v. Stroup, 249 F.2d 874 (4th Cir. 1957). "[T]he party against whom the motion is made must be given the benefit of every legitimate inference which can be drawn from the evidence; even if the facts are undisputed, the case must go to the jury if conflicting inferences may be drawn from the facts." 2B Barron and Holtzoff, Federal Practice and Procedure (Wright ed.) § 1075. Ortiz v. Greyhound Corp., 275 F.2d 770 (4th Cir. 1960). "The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is as probable as the other, has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of rea-

sonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958), cert. denied, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229. We think that conflicting inferences, all "within the range of reasonable probability," could be drawn from the undisputed evidence regarding the degree and nature of the malefactors' asserted control of Phoenix. Therefore, disposition of this case by directed verdict was inappropriate.

■ Substantive issues in this diversity suit as to the interpretation of the bond, imputation of knowledge to the corporation, corporate structure, etc., must be resolved according to Maryland law. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Aetna contends that the corporate charter vested all corporate power in the directors and that the board of directors abdicated this power to the executive committee, which was controlled by Coven and Marshall. Under Maryland law, a corporation's ordinary business powers are vested in its directors, Parish v. Maryland and Virginia Milk Producers Ass'n, 250 Md. 24, 242 A.2d 512 (1968), Warren v. Fitzgerald, 189 Md. 476, 56 A.2d 827 (1948), who are charged with a duty to conduct the corporation's affairs with such ordinary reasonable care as a reasonably prudent, careful, and skilled man exercises in the conduct of his own affairs. 19 C.J.S. Corporations § 764. Creation of an executive committee to exercise corporate power during the interim between board meetings is a common, legitimate device employed in corporate structures. The record contains stipulations that Coven and Marshall reported upon executive committee activities to the board of directors at its rather infrequent meetings and that the board ratified all executive committee action. There is no direct showing or stipulation in the record that the board of directors failed to pru-

dently consider the reports made to it by the management. Aetna contends that, because Coven and Marshall played a significant role in selecting all of the directors, the directors were *a fortiori* under their control. While a jury might draw such an inference from the facts, it could also legitimately find, in absence of contrary evidence, that the directors reviewed executive committee acts diligently and ratified them in good faith. Indeed, it is stipulated that at the January 26, 1960, directors' meeting Brig. Gen. Sam Dockrell, not alleged to be a member of the Coven-Marshall "coterie," "commended the co-chairman [Coven] of the Association for his detailed and informative report and voiced * * * the appreciation of all present * * *." Likewise, two reasonably probable but conflicting inferences might be drawn from the stipulated fact that some of the directors were business associates in other ventures with Coven, Marshall, Sutton, and Fields. A jury could infer either that all were co-conspirators or that they were honest men despite their connections with rogues. While the fact of Coven and Marshall's de facto power to select or dismiss directors tends to support the former inference, there is no direct evidence that Coven or Marshall exercised or threatened any coercive power over the rest of the directors. A jury might also reasonably infer that Coven and Marshall, as active managers of the business, were able to secrete their illicit acts from the board of directors, despite infrequent but apparently thorough reviews of their activities by the board and despite the stipulated fact that a thorough independent audit would have readily revealed their fraudulent activities and those of Miller recorded on the books of the corporation.[10] It is important to note that all of the evidence tending to establish control by Coven and Marshall over the board of directors is circumstantial and is, we believe, susceptible to varying, conflicting interpretations.

The undisputed facts of this case are readily distinguishable from those cases in which the "alter ego" or instrumentality doctrine, or legal principles closely akin thereto, have been employed to impute the knowledge of an agent to a corporation owned or controlled by him. "The general rule * * * is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation." William Danzer and Co. v. Western Maryland Ry., 164 Md. 448, 165 A. 463, 467 (1933), Lohmuller Bldg. Co. v. Gamble, 160 Md. 538, 154 A. 41 (1931). However, "knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation." Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 381 F.2d 245, 250 (4th Cir. 1967). As we have noted above, the undisputed evidence fails to establish beyond the existence of reasonable, conflicting inferences that Coven and Marshall had "substantial control" of Phoenix during the time the defalcations took place. In William Danzer and Co. v. Western Maryland Ry., *supra*, the Maryland court declined to impute knowledge of a contract made by the corporation's president to the corporation.

The appellee contends that because of the president's relation to the Danzer Company the personal knowledge

---

10. Even if the directors knew of the illicit transactions, it is arguable under Maryland law that this alone would not be enough to discharge the insurer. See McShane v. Howard Bank, 73 Md. 135, 20 A. 776 (1890). "Conceding that Ridgaway (the embezzler) was dishonest, and that the directors of the bank knew it, and still retained him in his position, without notice to the sureties, this could not release the sureties, even though it had been the duty of the directors to give such notice, unless it be held that the failure of one set of officers to discharge their duty will release the sureties of another delinquent officer, whereas * * * just the reverse is the law." *Id.*, 20 A. at 781.

which he acquired through his connection with the Maryland Lumber and Millwork Company must be imputed to the Danzer Company, on the theory that it is "merely the alter ego" of Danzer. But the evidence does not support that contention. Danzer does hold 90 per cent. of the capital stock of the corporation, is its president, and one of its directors. But those facts do not merge the identity of the corporation with his. It has other stockholders, other directors, and other officers holding common and preferred stock. It was incorporated as an independent entity by the state and functions as such and it is in fact separate and distinct from Danzer as from its other stockholders. There are cases, of course, in which the corporation is used as a mere shield or name for the perpetration of a fraud in which the courts will look beyond the corporate fiction to the realities which it screens but this is not such a case.

165 A. at 466.

Aetna relies upon the holding of West American Finance Co. v. Pacific Indemnity Co., 17 Cal.App.2d 225, 61 P.2d 963 (1936), that knowledge of a majority of West American's directors would be imputed to the corporation to release the indemnitor where those directors had defrauded the corporation. However, in that case, four dishonest officer-directors of the insured owned *all* of the insured's stock through various other corporations.

The district court relied heavily in its opinion upon Hartford Accident and Indemnity Co. v. Hartley, 275 F.Supp. 610 (1967), a case in which summary judgment was granted to the insurer under a fidelity bond. There were three partners in an unincorporated Georgia bank: the active managing partner and his mother and sister, whom the court found to be partners in name only. The court held that the fraud for which the bank sought to recover "was perpetrated by the firm's only active managing partner—its alter ego." *Id.*, 275 F.Supp. at 618. Therefore, the court imputed

knowledge of the fraud to the bank, on behalf of which the managing partner had represented in the bond application that no fraud had been committed.

■■ These cases in which knowledge of one or more officers, directors and owners of a business entity was imputed to that entity all involved situations where there existed no real possibility of any corporate control in persons other than the wrongdoers. The district court correctly stated that "[w]here corporate control has been abdicated by those charged with exercising such control and all corporate power is exercised by a few who perform misdeeds, knowledge of those misdeeds must be imputed to the corporation." Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 302 F.Supp. 832, 840 (D.Md. 1969). However, Aetna, which has the burden of proof as to its affirmative defenses, *e. g.*, Tendler v. Jaffe, 92 U.S. App.D.C. 2, 203 F.2d 14 (1953), cert. denied, 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344, has failed to conclusively establish that such is the case here. Therefore, Aetna was not entitled to a directed verdict based upon those of its affirmative defenses depending upon the imputation of the malefactors' knowledge to Phoenix.

■ As Aetna points out, some frauds had been perpetrated prior to Phoenix' application for the second bond. That application recited that all the insured's employees and officers had, to the best of its knowledge, theretofore faithfully performed their duties. It further stated: "Such knowledge as any officer signing for the Insured may now have in respect to his own personal acts or conduct, unknown to the Insured, is not imputable to the Insured." A fraudulent misrepresentation in such an application that the insured's employees have been faithful is deemed material to the risk undertaken by the insurer and renders the bond void ab initio. *E. g.*, Maryland Casualty v. Tulsa Industrial Loan Co., 83 F.2d 14 (10th Cir. 1936); Hartford Accident and Indemnity Co. v. Hartley, 275 F.Supp. 610

(M.D.Ga.1967). The application, by its terms, however, excludes the knowledge of the signer as to his personal acts from the representations made therein. Saul Marshall signed for the insured. It is stipulated fact that he participated in all the fraudulent transactions; therefore, his knowledge as to those transactions is not imputable to the corporation by the terms of the application. See, Maryland Casualty Co. v. Tulsa Industrial Loan Co., *supra*. Since, as we have held, the evidence viewed most favorably for Phoenix does not require imputation of the wrongdoers' knowledge to the corporation, Phoenix cannot be held by directed verdict to have knowingly made false representations in its second bond application.

As noted above, the bonds in question cover all losses discovered during their respective terms. Because Aetna has failed to establish beyond the existence of reasonable, conflicting inferences that knowledge of the fraudulent transactions should be imputed to the corporation as of the time those transactions occurred and because, therefore, the evidence must be interpreted most favorably to Phoenix, we must assume, for the limited purpose of reviewing the directed verdict, that the malefactors alone had knowledge of their various defalcations and that no "discovery" of the losses occurred until the conservator was appointed. Phoenix contends that the conservator purchased from Aetna additional time, expiring July 17, 1962, to discover, give notice of, and give proof of losses and that, assuming discovery by the conservator, notice and proof of loss were timely given. A lawsuit brought prior to July 17, 1962, by Aetna in Baltimore City Superior Court for declaratory judgment in this matter was dismissed upon stipulation by Aetna that the bonds covered losses discovered prior to July 17, 1961, and that time for proof of loss was extended. There is no contrary contention or showing on Aetna's behalf.

Both of the bonds provide: "This bond shall terminate as to any Employee

* * * immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Employee." Because Aetna has failed to establish as a matter of law that the wrongdoing employees' knowledge of their defalcations was imputable to the corporation, as of the times they were perpetrated, this bond clause is insufficient to support the directed verdict. Under an interpretation of the undisputed facts most favorable to Phoenix, no discovery took place until the conservatorship began.

Finally, Aetna contends that the undisputed facts conclusively establish that Coven and Marshall acted in the transactions complained of as directors, not as employees, and that their acts were therefore excluded from the bonds' coverage. Miller is conceded to have been an "employee" within the bonds' definition during his entire association with Phoenix. The term "employee" has no particular, restricted meaning and may have different meanings in different contexts. National Bank of Burlington v. Fidelity and Casualty Co. of New York, 125 F.2d 920 (4th Cir. 1942). A director of a corporation may or may not be an employee of the corporation. Wharton v. Fidelity-Baltimore National Bank, 222 Md. 177, 158 A.2d 887 (1960). The bonds provide in pertinent part that:

Employee means:

(1) any officer or employee of the Insured;

(2) any duly elected or appointed attorney of the Insured. * * *

The Maryland court has adopted this test for determining the existence of an employer-employee relationship: "Whether the alleged master in any case has the right, even if he does not exercise it, to control and direct the alleged servant, not only as to what shall be done but how it shall be done." *Id.*, 158 A.2d at 891. Aetna urges that Coven and Marshall were not acting as employees of the corporation when they perpetrated the losses in question despite the officers' titles they carried, the compensation they

received in form of cash and stock for services rendered, and the control they exercised by virtue of their executive offices over the day-to-day business of the corporation and its books of account. A director's duties ordinarily consist in attending meetings, exercising his judgment on proposed policies for the corporation and voting thereon. Ordinarily he has no power to issue orders to any officer or employee. *Id.*, 158 A.2d at 891. Thus, a large portion of Coven and Marshall's activities at Phoenix were more consistent with the powers and duties of an executive officer than with those of a director. Aetna argues that Coven and Marshall, because they constituted the entire executive committee until April-May 1960 and one-half of its membership after that time, exercised such complete control over the corporation as to render the corporation's right to control them illusory. The district court held that a "person in corporate authority who is responsible only to himself cannot be likened to an employee under the direct supervision of management and corporate authority." Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 302 F.Supp. 832, 840 (D.Md.1969). "In their role as executive committee, unchecked by the board of directors, [Coven and Marshall] were permitted to act with complete freedom." *Id.*, at 841. However, Aetna has failed to establish beyond the existence of reasonable conflicting inferences that Coven and Marshall were allowed to act with complete freedom. There is no direct evidence that they were not subjected to reasonable scrutiny by the board of directors in their activities as officers. There is only the circumstantial evidence discussed above, all of which is reasonably susceptible to conflicting inferences. Therefore, it cannot be said that, as a matter of law, the right of control over Coven and Marshall as officers which was vested in the entire board of directors was merely illusory. Instead, a jury might reasonably determine that real power of control existed in the board,

and if exercised little or not at all, it was because of the deception of corrupt officers inducing the board to believe that all was well and that direction and control were unnecessary.

The stipulated facts here are starkly different from the facts of those cases cited by Aetna which hold that no real employer-employee relationship exists where complete control of the corporation is lodged in the alleged employee. In Kerr v. Aetna Casualty and Surety Co., 350 F.2d 146 (4th Cir. 1965), Cudd and Coan were the principal officers of the insured, the only directors of the insured and owned all of its stock either directly or indirectly. "Cudd and Coan as directors probably had the technical right to control Cudd and Coan as officers. But, such a theoretical and unrealistic right of control did not make Cudd and Coan 'Employees' * * * covered by the bond." *Id.*, 350 F.2d at 154.

In Farmers' and Merchants' State Bank of Verdon v. United States Fidelity and Guaranty Co., 28 S.D. 315, 133 N.W. 247 (1911), the cashier of the insured bank obtained direct ownership of an absolute majority of the voting stock in the bank. Because he was "in position to absolutely control the affairs of the bank," he was held not to be an employee within the terms of the bond. As noted above, it is not clear in this case just who owned a controlling interest in Phoenix. It is clear, however, that Coven and Marshall did not alone directly own enough stock to control the corporation. Aetna contends that Coven and Marshall and their various associates owned a majority of the voting stock. No one contends that there is here such unity of ownership and control as was achieved by the cashier in *Farmers' and Merchants' Bank.* As we have previously stated, conflicting inferences, which must here be resolved in Phoenix' favor, can reasonably be drawn as to the degree of control exercised by Coven and Marshall over the group alleged by Aetna to have

controlled a majority of Phoenix' voting stock.[11]

■ Aetna also argues that Exclusion Section 2(c) of the bonds is a clear expression of its intention not to insure against the acts of persons in control of the insured. That section excludes from the bonds' coverage:

Any loss resulting wholly or partly from the wrongful act or default of any of the directors or trustees of the Insured who are not employed by the Insured at a salary, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured.

The plain meaning of Exclusion Section 2(c) is, contrary to Aetna's interpretation, that the acts of directors *"who are not employed by the Insured at a salary"* are excluded from the bond's coverage. (Emphasis added.) Section 2(c) clearly has no application to the acts of directors who *were employed* by Phoenix at a salary. Both Coven and Marshall received systematic compensation from Phoenix in the form of periodic cash payments and stock for services rendered by them as corporate officers. Therefore, Section 2(c) does not exclude the illicit acts of Coven and Marshall from coverage. Their fraud may be held outside the bonds' coverage only if the jury should find that their control of the corporation was so substantial as to negate the existence of an employer-employee relationship. Indeed, it should be read to evidence an intent by the parties not to exclude from the bonds' coverage a peculiarly dangerous animal: the paid employee-director who can de-

fraud the corporation in the course of his day-to-day duties as an employee, who has access to the corporate records, who implements the policies set by the board of dierctors, who can act as a director to insure that his fraud will not be discovered, and who, as a director, can procure *ex post facto* approval for his fraudulent transactions. For example, under a view of the facts most favorable to Phoenix, the Phoenix board of directors authorized the sale of Phoenix stock at $3 per share. Coven and Marshall, acting as officers, sold it to Great Eastern Corporation, which they controlled, for less than the authorized consideration. They then procured the board of directors' approval of all acts of the officers. The insuring agreements contained in the bonds provided that Aetna would indemnify Phoenix for: *"Any* loss through *any* dishonest, fraudulent or criminal act of *any* of the Employees, committed anywhere and whether committed alone or in collusion with others * * *."* (Emphasis supplied.) The ambit of this provision is broad and its coverage of the wrongful acts of *employee*-directors plainly includes these thefts. A jury could thus scarcely fail to reasonably interpret the stipulated facts to find that Coven and Marshall were employees and that their acts were within the bonds' coverage.

■ Because Aetna has not established any of its affirmative defenses sufficiently to negate the existence of conflicting, reasonably probable inferences, it was not entitled to a directed verdict in its favor. The district court erred in not submitting the case to the jury for decision. Indeed, we note in passing that it is frequently the better practice, where all of the evidence has been presented to the jury and at the close of the evidence a motion for directed verdict is made, for the trial

11. Apparently, the district court was not certain that only one inference could reasonably be drawn from the facts as to ownership of Phoenix stock: "[A]ll but one of the B stockholders is in some way connected with Coven and Marshall and

Phoenix and a jury *could easily draw the inference* that all were implicated in its scheme * * *."* (Emphasis added.) Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 302 F.Supp. 832, 841 (D.Md.1969).

judge to reserve ruling on that motion until the jury has reached a verdict. Should it then be deemed necessary to grant the motion, the jury verdict can be reinstated without the necessity of costly retrial if, on appeal, the directed verdict or judgment notwithstanding the verdict be found in error. Wright, Federal Courts (2d ed.) ch. 10 § 94; 2B Barron and Holtzoff (Wright ed.) § 1072.

Reversed and remanded.