**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellee-Cross Appellant,**

v.

**A. W. LOTT, Defendant,**

**John A. Wheeler, Ottis Isom, et al., Defendants-Cross Appellees,**

**Aetna Casualty & Surety Company, Defendant-Appellant.**

No. 71-2065.

United States Court of Appeals, Fifth Circuit.

April 20, 1972.

Rehearing and Rehearing En Banc May 23, 1972.

---

James A. Williams, C. Edward Fowler, Jr., Woodfin C. Henderson, Bailey, Williams, Westfall & Henderson, Dallas, Tex., for defendant-appellant.

Frank L. Skillern, Jr., Royal H. Brin, Jr., Dallas, Tex., M. Warlick Carr, Lubbock, Tex., Leslie H. Fisher, Gen. Counsel; William E. Murane, Gen. Counsel, Myers N. Fisher, Asst. Gen. Counsel, F.D.I.C., Washington, D. C., for Federal Deposit Ins. Corp.; Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., Key, Carr, Evans & Fouts, Lubbock, Tex., of counsel.

James H. Milam, Crenshaw, Dupree & Milam, Lubbock, Tex., for John A. Wheeler.

George F. Gilkerson, Lubbock, Tex., for Ottis Isom.

Travis D. Shelton, Lubbock, Tex., for A. W. Lott.

Charles L. Cobb, Jack P. Driskill, McWhorter, Cobb & Johnson, Lubbock, Tex., for Leslie Huckaby and Leon Williams.

Before BELL, DYER and CLARK, Circuit Judges.

DYER, Circuit Judge:

In this appeal we are called upon to decide whether the notice requirements of a banker's blanket bond were complied with and whether the bank president's knowledge of his own fraudulent acts is to be imputed to the bank for purposes of terminating liability under the bond.

A jury, on special issues, found against Aetna on its bonds. We affirm the judgment of the district court.

On October 21, 1966, Aetna issued two banker's blanket bonds to the Lorenzo State Bank, under the terms of which Aetna agreed to indemnify the bank against losses sustained through any dishonest, fraudulent or criminal acts on the part of an employee. Losses occurred as the result of the fraudulent acts of the bank's president, Lott. The bank was closed by state authorities on February 5, 1967, and the assets were assigned to the Federal Deposit Insurance Corporation (FDIC). The FDIC gave Aetna notice of the loss on February 8, 1967 and filed proof of loss on July 26, 1967 after requesting and receiving an extension of time from Aetna.

Lott began working for the Lorenzo State Bank in 1934. He became a director in the early 1950's and the president in 1957. Huckaby was a vice-president, loan officer and had been a director for thirteen years. Williams was also a vice-president, loan officer and had been a director for nine years. Both men started working for the bank as bookkeepers and worked their way up through the years. The remaining two directors, Wheeler and Isom, were farmers who had been directors for twenty and thirteen years respectively.

The bank's troubles began in mid-1966. In May of that year the state banking department conducted an examination. Its report was particularly critical of two lines of credit—the Deepwell Pump Corporation, in which Lott and Wheeler both held an interest, and J & J Joiner. Credit extended to these accounts was in excess of the bank's legal loan limit [1] although the violations were corrected subsequent to the examination. The report also criticized Joiner and Deepwell overdrafts

that had been held as cash items [2] for several weeks. The Joiner line of credit was also singled out for its lack of performance. The examiner recommended that it be handled by a larger bank for its concentration of credit was much too large for the Lorenzo bank to service. When the examination was concluded the examiner held a critique with Lott, Wheeler and Williams. In addition, all directors signed a form stating that they had either read the report or caused the report to be read to them.

Another examination was conducted by the FDIC in March, 1967. It was again noted that the holding of Deepwell cash items resulted in an excessive and illegal loan. With respect to the Joiner accounts, the examiner noted that excessive cash items were held and loan violations had taken place but they were corrected during the course of the examination. The examiner explained his report to Lott, Wheeler and Isom. Isom and Wheeler expressed concern to Lott about the discrepancies but Lott assured them that the problems were being corrected. Huckaby and Williams were not present at this meeting; however, they did have knowledge of the report. The examiner recommended no further action be taken at that time because he believed that Lott would take corrective action.

The meeting with the FDIC examiner was actually the last meeting the board of directors held until shortly before the bank closed in February 1968. During that period of time Huckaby, at Lott's direction, prepared minutes of the monthly board meetings although, as a matter of fact, the meetings were never held. Huckaby notified the directors of regular monthly board meetings but Lott would then cancel the meeting. Huckaby never knew from month to month whether there would be a meeting or not.

---

1. The bank's legal loan limit to any one person or corporation is 25% of its capital and certified surplus. Vernon's Tex. Civ.Stat.Ann. art. 342–507 (1959). The Lorenzo State Bank had a capital of $100,000 and a surplus of $200,000. The legal loan limit was $75,000.

2. Cash items are overdrafts held by the bank in lieu of dishonoring them. Joiner overdrafts amounted to $15,917.27 and Deepwell overdrafts amounted to $26,214.-05.

The state department of banking conducted a further examination of the bank in June 1967. Excessive loans to Deepwell and Jimmy Joiner were again noted. The examiner found that the legal loan limit to Deepwell was exceeded because the proceeds of a loan to George C. Carter went to the use of Deepwell. Likewise, in Joiner's case, a loan to Johnnie Joiner for the benefit of Jimmy Joiner created an excessive loan. Although a letter from the examiner to the board of directors did note some improvement on the overall dollar volume of classified loans, it was critical of Lott's continued maintenance of excessive credit to Deepwell and the Joiners. As a result, Lott was requested to go to Austin for a personal conference with the department. Lott did not inform the board of this letter. He went to Austin in August 1967 and again in November 1967 for conferences. The directors had no knowledge of these conferences. The examiner had not uncovered the fact that there were no monthly board meetings since March 1967 because of the minutes Huckaby had prepared.

When Lott received the bank examiners' reports he read them to the other directors but often omitted reading the critical portions about the Deepwell and Joiner loans. He kept the directors ignorant of the facts that the loan to Carter was for the benefit of Deepwell and that the loans to Con Davis Company and Johnny Vineyard were for the use and benefit of Jimmy Joiner. The directors were also unaware of the cash items held for Deepwell and Joiner because whenever this topic was discussed, the total amount of cash items was never broken down by individual account.

All the directors were aware of some of the excessive loans to Deepwell and Joiner and questioned Lott about them. Lott would reassure them, however, that he was taking care of the problem. The directors trusted Lott to rectify any irregularities. Lott had corrected excessive loans in the past by participation of the loans with other banks in order to remain within the legal limit. Such participation effort needed no board approval, and this was the manner in which Lott reduced some of the excessive loans on one or more occasions.

The jury found that Lott had committed dishonest, fraudulent or criminal acts with respect to cash items held for and excessive loans made to Jimmy Joiner and Deepwell either directly or through subterfuges;[3] that outside directors Wheeler and Isom did not know nor

---

3. The jury found that Lott had committed the following dishonest, fraudulent or criminal acts:
   a. Accumulation of cash items and the making of the $55,000.00 loan to Deepwell on March 23, 1967, out of which the cash items were paid.
   b. Accumulation of cash items and the making of the $160,000.00 loan to Deepwell on December 1, 1967, out of which the cash items were paid.
   c. Holding cash items at Lorenzo State Bank of $44,297.16.
   d. Allowing a Deepwell overdraft of $2,692.39.
   e. Accumulation of cash items and the making of loans to Carter Pump and Engineering Company with the proceeds going to Deepwell to pay the cash items in the amount of $13,500.00 on June 2, 1967, $12,500.00 on May 25, 1967 and $45,000.00 on May 23, 1967.
   f. Overdraft of $18,798.83 in the account of K-3 Ranch.
   g. $30,000.00 alleged loan to Johnnie Joiner by note dated July 17, 1967 with proceeds going to J & J Joiner for Jimmy Joiner.
   h. $7,000.00 loan to Alvin Joiner on May 17, 1967.
   i. Authorizing Citizens National Bank to charge Lorenzo State Bank in the amount of $82,676.76 to pay the personal indebtedness of A. W. Lott.
   j. Accumulation of cash items and the making of two alleged loans to Sam A. Whiteside and J. A. Whiteside dated September 15, 1966 with the proceeds going to Deepwell to pay the cash items.
   k. $88,569.50 loan to Johnnie Joiner by two notes originally dated May 30, 1966 renewed March 9 1967.
   l. $57,000.00 note to Con Davis Cattle Company dated January 25, 1968, with proceeds going to or for the benefit of J & J Joiner for the benefit of Jimmy Joiner.

should they have known of Lott's fraudulent acts; and that inside directors Huckaby and Williams did not know of Lott's fraudulent acts but that they should have known about two loans to Deepwell used to pay cash items and that some cash items were held. Accordingly, the jury found that Huckaby and Williams failed to properly supervise the bank's business in such a manner as to prevent losses from the fraudulent acts, but this failure on their part was not negligence or a proximate cause of the losses to the bank.

The bonds issued by Aetna required the bank to furnish Aetna with affirmative proof of loss within 100 days after a discovery by any director or officer not in collusion with the person in default. The bonds further provided that they would terminate as to any employee immediately upon discovery by the bank of any dishonest or fraudulent act on the part of such employee.

Aetna appeals the jury verdict on the grounds that the directors all knew that Lott was illegally extending excessive credit to Deepwell and the Joiners more than 100 days before notice and proof of loss were given and that they were not in collusion with Lott. Aetna argues that the notice requirements were not complied with and no recovery can be had under the bonds. Aetna further urges that under Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., 4 Cir. 1967, 381 F.2d 245 (*Phoenix* I) and, 1970, 427 F.2d 862 (*Phoenix* II) Lott was in sole control of the Lorenzo State Bank as the president and majority stockholder and, as such, he should not be allowed to insure himself against his own fraud.

FDIC counters that the jury verdict should be upheld, but that, in any event, if the directors had notice of the loss in excess of 100 days of the date notice was given to Aetna, then as a matter of law they were in collusion with Lott and no notice was required. In its protective cross-appeal FDIC submits that if this Court finds lack of coverage under the bonds then the directors should be found liable for their breach of duty and judgment rendered against them in favor of FDIC as assignee of the bank's assets.

The directors, of course, deny that they had notice of Lott's fraud and assert that they were not negligent in the performance of their official duties.

### Sufficiency of the evidence to support the jury findings

Aetna moved for a directed verdict on the ground, *inter alia,* that the directors had knowledge of Lott's fraudulent conduct and that such knowledge was imputed to the bank as a matter of law. The motion was denied as was Aetna's motion for judgment notwithstanding the verdict. The denial of both these motions is measured by the standard enunciated in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374 (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of the one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury . . .

In applying the test we must bear in mind what type information the directors must have had in order to nullify Aetna's liability under the bonds. The fact that the directors may have had knowledge of irregularities and violations, i. e., the holding of excessive cash items and exceeding the legal loan limit, is not by itself sufficient to trigger the

bank's obligation to notify Aetna. We recently had occasion to point out that:

> The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice 'until he [has] acquired knowledge of *some specific fraudulent or dishonest act which might involve the* [Insurer] *in liability for the misconduct.*' Notice is not required when the obligee merely suspects or has reason to suspect wrongdoing. American Surety Co. v. Pauly, 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898).

Federal Deposit Insurance Corporation v. Aetna Casualty & Surety Co., 5 Cir. 1970, 426 F.2d 729, 739.

■ We think the district court properly framed the issue when it instructed the jury that: "The term, 'fraudulent or dishonest act or acts' as used in the instructions here given you, means an act or acts which involve bad faith, wilfulness, breach of honesty, and also a want of integrity or moral turpitude by the person committing the acts. A criminal act as used in this charge is one that violates one of the criminal laws of the State of Texas that are involved in this case." This charge correctly informed the jurors what type of knowledge the directors needed in order to activate the time and notice requirements of the bonds.

■ This issue was particularly well suited for jury determination and upon review of the evidence we think reasonable men might have reached different conclusions as to its outcome. All of the directors made inquiries of Lott concerning the Deepwell and Joiners loans. Lott assured them that all problems would be taken care of and in fact some of them were, albeit temporarily. The first state examination report noted that the illegal loan excesses to Deepwell and Joiner had been corrected. The FDIC report stated that the violations in the Joiner account had been rectified during the examination. The last state report noted that although there were violations the bank's overall dollar volume of classified loans had improved. In light of these positive aspects and Lott's attempts to keep detrimental information from the directors, reasonable men could believe that the directors thought the irregularities were being or would be corrected and were not the result of fraudulent, dishonest or criminal acts. Viewing this evidence in favor of the verdict as true and giving it the benefit of all permissible inferences that help sustain the jury's decision, we find it sufficient to support the jury's findings. See Laird v. Hudson Enginering Corp., 5 Cir. 1971, 449 F.2d 216, 217; Stockton v. Altman, 5 Cir. 1970, 432 F.2d 946, 950.

*The sole control theory*

Aetna next urges that one in sole control of the bank should not be allowed to insure himself and profit from his own fraud. *Phoenix I, supra,* 381 F.2d at 251. While we agree with this principle we find it inapplicable under the facts of this case.

Lott was not the bank's sole shareholder [4] and the district court's judgment specifically excludes Lott from participating in any recovery.[5] Innocent shareholders and creditors should not have to bear a loss when the fraudulent majority shareholder will not benefit from his fraud. Moreover, the facts here

---

4. The ownership of the bank was as follows:

    Lott—520 shares
    Williams—200 shares
    Huckaby—187 shares
    Wheeler—37 shares
    Isom—25 shares
    others—31 shares

5. The judgment provides:
    IT IS FURTHER ORDERED, ADJUDGED and DECREED that in the event Federal Deposit Insurance Corporation, after final accounting of all its losses and recoveries in connection with the Lorenzo State Bank, determines there are funds due and owing to the stockholders of Lorenzo State Bank, Federal Deposit Insurance Corporation is ordered to return those funds which would be due A. W. Lott as a stockholder to Aetna . . .

do not show that Lott was in sole control of the bank.

■ While it may be true that in this small county bank, not unlike hundreds throughout the country, there was a controlling shareholder who was also an officer and who actually ran the bank, this is not to say that the directors abdicated their duties and responsibilities with which they were charged by law. The court went to some pains to charge the jury fully on the subject and its verdict, sufficiently supported, puts the question to rest.[6]

Furthermore, we are unimpressed with Aetna's reliance upon the district court's opinion in Hartford Accident and Indemnity Co. v. Hartley, M.D.Ga.1967, 275 F.Supp. 610, aff'd, 5 Cir., 1968, 389 F.2d 91, in which three partners of an un-incorporated state bank were the active managing partner and his mother and sister who acted in name only. There the court held that the fraud for which the bank sought to recover "was perpetrated by the firm's only active managing partner—its alter ego'." Id., 275 F.Supp. at 618. As we have stated, this was not the case here.

■ Generally, an officer's or director's knowledge acquired while acting within the scope of his duties will be imputed to the bank. 10 Am.Jur.2d, Banks § 163 (1963). However, where, as here, Lott fraudulently dealt with the bank in his own interest, he is deemed to have an adverse interest and the knowledge possessed by him in the transaction is not imputable to the bank. See Phoenix II, supra, 427 F.2d at 869; Federal Deposit Insurance Corporation v. Aetna Casualty & Surety Co., supra, 426 F.2d at 739; Odom v. Ins. Co. of State of Pennsylvania, 441 S.W.2d 584, 591 (Tex.Civ.App.—Austin 1969) aff'd, Tex. 1970, 455 S.W.2d 195; Southern Farm

Bureau Casualty Ins. Co v. Allen, 5 Cir. 1967, 388 F.2d 126, 131.

Relying on Phoenix II, supra, Aetna also contends that the other director's knowledge of their own fraudulent transactions is imputed to the corporation itself for purposes of applying the fidelity bonds' exclusions, conditions and limitations. But the premise upon which Aetna builds its argument is unsound. The jury found that none of them—Huckaby, Williams, Wheeler and Isom—knew of the dishonest, fraudulent or criminal acts of Lott. As was said in Phoenix II, supra, 427 F.2d at 869, "A jury could infer that all [of the directors] were co-conspirators or that they were honest men despite their connection with rogues." The jury's verdict also forecloses Aetna's asertion that it would be contrary to equitable principles to permit these directors to profit from their neglect of duties which brought about the losses to the bank. In their answers to special interrogatories the jury categorically found that none of the other directors knew of Lott's dishonest acts nor was their ignorance a proximate cause of the bank's losses.

We have considered the other errors asserted by Aetna and find them to be without merit. The judgment of the district court is

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BELL, DYER and CLARK, Circuit Judges.

PER CURIAM: The Petition for Rehearing is DENIED and no member of this panel nor Judge in regular active service on the Court having requested

---

6. There were conflicting inferences on whether Lott was allowed to act with complete freedom. The "jury might reasonably [have] determine[d] that real power of control existed in the board, and if exercised little or not at all, it was be-cause of the deception of [Lott] inducing the board to believe that all was well [or would be] and that direction and control were unnecessary." Phoenix II, supra, 427 F.2d at 872.

that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is DENIED.