JOHN V. SPENCER, individually and as trustee, & others[1] *vs.*
FRANCIS A. DOYLE.[2]

No. 97-P-2284.

Middlesex. May 17, 1999. - August 21, 2000.

Present: BROWN, LAURENCE, & RAPOZA, JJ.

*Agency,* What constitutes, Scope of authority or employment. *Contract,* Perfor-
mance and breach, Implied covenant of good faith and fair dealing.
*Consumer Protection Act,* Availability of remedy, Trade or commerce.
*Accountant.*

In an action for breach of contract and breach of the implied covenant of good
faith and fair dealing, there was no evidence in the record of summary
judgment materials to support a conclusion that a collection company had
engaged the defendant, an accounting firm, for any purpose other than a
routine audit, or for any purpose relating to the plaintiffs, who were
financial participants in the company, that would have created an agency
relationship between the plaintiffs and the company; summary judgment
was correctly ordered for the defendant. [8-12]
Where parties in a civil action had no commercial relationship, no claim under
G. L. c. 93A could be maintained and nothing in summary judgment materi-
als demonstrated that the defendant, an accounting firm, had actual
knowledge of any reliance by the plaintiffs, who were financial participants
in a collection company, on the defendant's audit of the company. [12-15]

CIVIL ACTION commenced in the Superior Court Department on
September 2, 1994.

The case was heard by *Stephen E. Neel,* J., on a motion for
summary judgment.

*Philip Y. Brown* for the plaintiffs.

*Richard d'A. Belin* for the defendant.

RAPOZA, J. The plaintiffs appeal from summary judgment

[1]The plaintiffs are participants in a business arrangement with Business
Funding Group, Inc.

[2]Francis A. Doyle is a partner of Coopers and Lybrand, a general
partnership.

entered in favor of the defendant. In essence, the plaintiffs claim that (1) summary judgment was improper because genuine issues of material fact were in dispute; (2) the lower court erred in finding that no agency relationship existed between the plaintiffs and a party with whom the defendant contracted; and (3) the lower court erred in finding that the plaintiffs could not assert a claim under G. L. c. 93A, § 11. We affirm.

The facts of this case, though extensive, may be distilled to the following. Business Funding Group, Inc. (BFG), was a collection company which purchased accounts receivable from creditors at a discounted rate using either its own funds or those advanced by individual investors (participants). The participants (who included the plaintiffs in this case), as a term of their contract with BFG, each agreed to maintain a certain sum of money to be held by BFG that would be immediately available as an advance should BFG plan to purchase an account on behalf of the participant. BFG had sole discretion to purchase an account, unless the account failed to meet certain criteria, in which case approval from the participant was required.

BFG would then undertake to collect the money owed on these accounts and, if successful, would return the participant's initial advance along with an additional sum, based on a predetermined percentage of the participant's advance. BFG would keep the remainder of the collection as profit. BFG agreed that, if it was unsuccessful in collecting enough money to enable it to repay the participant his advance along with the additional amount within 120 days of the purchase of the account, it would use whatever funds were collected to compensate the participant.

At a May, 1989, board meeting, BFG decided to retain the accounting firm of Coopers and Lybrand (C&L), of which the defendant is a general partner, to conduct an audit of the company's financial status. According to the minutes of this meeting, BFG wished to have the audit conducted in order to prepare for a possible public offering. Several audits were conducted over the next two years. In time, business for BFG declined, and the company was placed in receivership.

The plaintiffs are a group of individual participants who advanced funds to BFG for the purchase of accounts on their behalf. In their amended complaint, the plaintiffs allege that C&L performed an inadequate audit of BFG and inaccurately stated that the financial statements provided by BFG fairly

presented its financial position. The plaintiffs allege further that, as a result of the audit, they advanced BFG approximately $4 million in funds which were unaccounted for at the time BFG was placed in receivership. The plaintiffs assert that (1) C&L's allegedly improper audit constituted a breach of both an express contract and an implied covenant of good faith and fair dealing between C&L and the plaintiffs, on the theory that BFG, in hiring C&L to perform the audit, was acting merely as an agent for the plaintiffs; and (2) C&L committed unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11, through its "materially false and misleading" audit.[3]

1. *Agency.* Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as matter of law. See *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991). The plaintiffs claim that the granting of summary judgment on the issue of agency was improper, because "[w]hether one has acted as an agent is ordinarily a question of fact." *Pedersen* v. *Leahy,* 397 Mass. 689, 691 (1986). *Anderson* v. *Osgood,* 2 Mass. App. Ct. 800, 801 (1974). However, summary judgment is proper where proof of an essential element of a party's claim "is unlikely to be forthcoming at trial." *Flesner* v. *Technical Communications Corp.,* 410 Mass. 805, 809 (1991). Such is the case here.

Agency may be defined as resulting from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Kirkpatrick* v. *Boston Mut. Life Ins. Co.,* 393 Mass. 640, 645 (1985), quoting from Restatement (Second) of Agency § 1 (1958). It may be true that, as to the individual accounts receivable which BFG purchased on behalf of any given individual participant, BFG was acting as the agent of the participant. The contract between BFG and the participant explicitly states, "Purchaser is desirous of appointing BFG as its agent to engage in certain of such purchases and to manage the collection of such invoices on Purchaser's behalf . . . ." While the language in a contract is not determinative, it is evidence of the extent of agency. See Restatement (Second) of Agency § 376 ("[T]he existence and extent of the duties of the agent to the principal are

---

[3]The plaintiffs also asserted claims of negligence and negligent misrepresentation. They voluntarily dismissed these claims with prejudice prior to the defendant's motion for summary judgment.

determined by the terms of the agreement between the parties
. . .").

The arrangement between the participants and BFG may be
seen as a "factoring" relationship. See Black's Law Dictionary
612 (7th ed. 1999) (defining "factor" as "[o]ne who buys ac-
counts receivable at a discount"). We note that, under the agree-
ments pursuant to which BFG was to purchase accounts receiv-
able as agent of the participants, the participants' right to control
BFG's collection activities was quite limited. See Restatement
(Second) of Agency § 14 comment b (principal may agree not
to exercise control and to permit agent free exercise of discre-
tion in the case of certain recognized agents such as "attorneys
at law, factors, or auctioneers"). The contract between BFG and
an individual participant provided, "[T]he agent shall have full
power and authority to execute any agreements or take any ac-
tion consistent with such purpose and the provisions of this
agreement, in its own name on behalf of purchaser." Moreover,
each participant agreed to maintain a certain sum of money that
would be held by BFG to purchase accounts. At the same time,
the participants could not prevent BFG from buying an account
receivable with money from this available amount if the ac-
count met certain predefined criteria.[4] If BFG successfully col-
lected on the account, the participant would receive (in addition
to the repayment of his advance), a return based not on a
percentage of the profit from the account, but rather on a
percentage of his advance. The only actual control which the
participant had over the process was the ability to terminate the
availability of the advanced funds on thirty days' written notice
and, in the event of incomplete payment within 120 days, the
right to review information kept by BFG "which may have a
bearing on [the participant's] ability to receive payment in
full."

It is not sufficient, however, to conclude that an agency
relationship existed as to BFG's attempts to collect for the
benefit of each participant. It is axiomatic that agency for one
purpose does not equate to agency for all purposes. See *Shea* v.
*Bryant Chucking & Grinder Co.*, 336 Mass. 312, 314 (1957)
("A person may be an agent or a servant as to one part of an
undertaking, and an independent contractor as to other parts");

---

[4]When a prospective account receivable did not meet the predefined criteria,
the participant had discretion over whether his or her funds could be used to
purchase the account.

*Hudson* v. *Massachusetts Property Ins. Underwriting Assn.*, 386 Mass. 450, 456-457 (1982) (statute which deemed insurance broker an agent of insurance company in one circumstance did not make the broker a general agent of the company); *In Re Shulman Transp. Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("Even though a person is termed an agent, he may, in fact, act as such in some matters but not in others"). Thus, the mere fact that BFG may have served as an agent for a participant for the purpose of purchasing and collecting on a particular account does not mean that BFG served as agent for the participant in BFG's business ventures separate from that account.

This being the case, we must determine whether BFG contracted with C&L in order to facilitate investment in and collection on the accounts BFG purchased on behalf of each participant or whether BFG contracted with C&L in order to further its own, independent business goals.

As we have stated, according to the minutes of a May, 1989, board meeting, BFG debated hiring an accounting firm to conduct an audit "in order to prepare for a possible public offering." After certain board members voiced concern about the expense of hiring C&L, another board member stated that C&L had agreed to perform the audit for what the board felt was an acceptable price, and the board decided to retain C&L.

It is noteworthy that no mention was made of using the audit to assist in the collection of accounts held by participants or to encourage participants to continue to use BFG to purchase, and collect on, accounts receivable. Additionally, no mention was made of any input by individual participants regarding the decision to retain C&L, or indeed of any right of the participants to control BFG's conduct with respect to its potential relationship with C&L. See Restatement (Second) of Agency § 14 comment a (one essential characteristic of agency is the right of the principal to control "what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times . . . . The extent of the right to control . . . is an important factor in determining whether or not a master-servant relation between them exists").

Also worthy of consideration are the three "engagement letters" C&L sent to BFG, which "set forth our understanding of the terms and objectives of our engagement, the nature and scope of the services we will provide, and the related fee ar-

rangements." According to the engagement letters, the purpose of the audit was to express C&L's opinion concerning whether BFG's financial statements fairly presented the financial position of BFG.

In none of these engagement letters were the participants, either individually or collectively, identified or even mentioned. The letters were addressed to the president of BFG and stated that C&L expected BFG to supply certain information concerning its finances and internal control structure. Finally, the engagement letters each contained a paragraph stating that C&L required BFG's management, at the conclusion of the audit, to provide a representation letter confirming its responsibility for the preparation of the financial statements, the availability of financial records, and the completeness and availability of board meeting minutes. Again, the participants were not mentioned.

In response to this provision, BFG, through letters signed by its president and vice-president, confirmed that it was responsible for the fair presentation of its financial position and that it had made available all financial and accounting records, as well as all minutes of meetings of shareholders and directors. BFG went on to confirm that there had been no material transactions not recorded in the accounting records, that there were no irregularities in management, and that the company had complied with all aspects of its debt and contractual agreements. The letters confirmed also that BFG had satisfactory title to all assets which it owned and that the "amounts disclosed as other long term assets represent valid credits to be entirely consumed by the company . . . ." Nowhere in these confirmatory letters was there any mention of the participants. Rather, the letters confirmed BFG's independent existence and operation, as well as its ownership of various assets and its independent claims on various accounts and credits.

In sum, there is no indication in the summary judgment materials that BFG engaged C&L for any purpose relating to the service BFG provided to the participants. BFG's decision to retain C&L was made by the directors of BFG; the audit was paid for with BFG's money and was conducted according to terms negotiated by the officers of BFG and C&L; at no time were the participants involved in any aspect of the decision-making process of any facet of the audit; and, finally, there is no indication that C&L ever contemplated, or would have had any reason to contemplate, that it was performing anything

other than a routine audit of BFG's financial statements.[5] Therefore, BFG was not acting as an agent for the participants when it contracted with C&L, and summary judgment was properly granted for the defendant on the plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

2. *G. L. c. 93A.* The plaintiffs also raised a claim under G. L. c. 93A, § 11, asserting that C&L's allegedly inaccurate audit constituted an unfair or deceptive act.[6] An "action pursuant to G. L. c. 93A is 'neither wholly tortious nor wholly contractual in nature.' . . . Even so, claims of unfair or deceptive acts or practices may be founded on activities that more closely resemble either a traditional breach of contract action, . . . or an action in tort." (Citations omitted.) *Standard Register Co.* v. *Bolton-Emerson, Inc.,* 38 Mass. App. Ct. 545, 548 (1995). Therefore, a claim brought pursuant to G. L. c. 93A may encompass conduct which amounts to, for example, misrepresentation. See *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979) ("[A] misrepresentation in the common law sense would . . . be the basis for a c. 93A claim"). In order for a c. 93A claim to remain viable, however, there must exist some "commercial relationship" between the parties or the plaintiffs must demonstrate that the defendant's actions interfered with "trade or commerce." *First Enterprises, Ltd.* v. *Cooper,* 425 Mass. 344, 347 (1997). See *Standard Register Co.* v. *Bolton-Emerson, Inc.,* 38 Mass. App. Ct. at 551 (relationship must consist of something "more than a minor or insignificant business relationship"). As we have discussed above, there was no commercial relationship between the parties which placed C&L and the plaintiffs in privity with one another.

The plaintiffs argue, however, that even in the absence of such a relationship between the parties, they are still permitted to raise a claim against C&L on the basis of the Supreme Judicial Court's recent decision in *Nycal Corp.* v. *KPMG Peat Marwick LLP,* 426 Mass. 491 (1998).

---

[5]We are aware of the existence of an internal memorandum between a partner of C&L and one of his associates, in which the partner discusses the participants. We address the relevance of this memorandum in our discussion of the plaintiffs' G. L. c. 93A claim, *infra.*

[6]General Laws c. 93A, §§ 2 and 11, "make unlawful 'unfair or deceptive acts or practices in the conduct of any trade or commerce' between two businesses." *Massachusetts Farm Bureau Fedn., Inc.,* v. *Blue Cross of Mass., Inc.,* 403 Mass. 722, 729 (1989), quoting from c. 93A, § 2.

In *Nycal*, a case involving a claim of negligent misrepresentation, the court considered for the first time "the scope of liability of an accountant to persons with whom the accountant is not in privity." *Id.* at 493. The court, after review of standards from various jurisdictions and commentators, concluded that an accountant may be liable to a party with whom the accountant is not in privity only where the party asserting the claim "can demonstrate 'actual knowledge on the part of accountants of the limited — though unnamed — group of potential [third parties] that will rely on the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence.' " *Id.* at 498, quoting from *First Nat'l Bank of Commerce* v. *Monco Agency Inc.*, 911 F.2d 1053, 1062 (5th Cir. 1990). "The accountant's knowledge is to be measured 'at the moment the audit [report] is published, not by the foreseeable path of harm envisioned by [litigants] years following an unfortunate business decision.' " *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 498, quoting from *First Nat'l Bank of Commerce* v. *Monco Agency Inc.*, 911 F.2d at 1059.

The plaintiffs point to the fact that BFG included C&L's name in BFG's promotional materials in order to attract new participants. But even if BFG did try to attract new participants through the use of C&L's name, this was an act by BFG, not C&L; there is nothing in the summary judgment materials indicating that C&L knew BFG would engage in such promotional activities. The unilateral action by BFG did not establish that C&L had actual knowledge of any reliance by participants on the audit so as to create a commercial relationship between the participants and C&L, which is necessary to a claim under c. 93A, § 11.

As to whether C&L's audit can be deemed an interference with trade or commerce, we conclude that it cannot. This is not a case like *Kirkland Constr. Co.* v. *James*, 39 Mass. App. Ct. 559 (1995), in which this court permitted a c. 93A claim to proceed (reversing a judgment which had dismissed the action for failure to state a claim under Mass.R.Civ.P. 12[b][6], 365 Mass. 755 [1974]). In that case an attorney, in the course of a sale of services between two distinct businesses, provided unfounded assurances to the plaintiff seller that the attorney's client (the buyer) was able to pay for the services. See *id.* at 563-564. Here, by contrast, even if there were evidence that the plaintiffs had relied on C&L's audit, there is no indication that

C&L intended or anticipated such reliance. Here, also, the participants' only contact with C&L was to confirm, at BFG's request, the accuracy of the statement relating to each participant's account. In other words, there is nothing in the record demonstrating that C&L "injected" itself into trade or commerce. *First Enterprises, Ltd. v. Cooper,* 425 Mass. at 348.

Accordingly, it would not avail the plaintiffs even if we were to apply the *Nycal* standard to this case. It is not enough that C&L may have had actual knowledge of the existence of the participants and their relationship with BFG. In order to meet the first part of the *Nycal* test, the plaintiffs would need to prove that C&L actually knew that the plaintiffs would rely upon the audit.

On the summary judgment record before us, it has not been made to appear that C&L anticipated such reliance. To the contrary, in the various contracts between the participants and BFG that are included in the record, there is language to the general effect that, "[i]n making the decision to engage in Transactions hereunder, Purchaser is relying upon information provided by BFG in the Confidential Transaction Sheet or otherwise provided in writing by an officer of BFG." The "information provided by BFG" consisted of data such as from whom BFG would purchase the account, the face value of the receivables, the discount rate, and the like. None of this information was provided by C&L.

It is true that C&L knew that BFG performed debt collection services on behalf of certain individuals. The plaintiffs point to an internal C&L memo in which a C&L partner describes to his associate BFG's statement that "in certain situations they are only acting as an agent in purchasing accounts receivable on behalf of wealthy investors. The money that is given to them is not a loan but is given to them as money to be managed . . . . In other situations, Business Funding Group will buy receivables for their own account and actually own the receivables."

This statement, however, does not mean that C&L regarded the plaintiffs as BFG's principals. To the contrary, it illustrates C&L's correct understanding that BFG served as agent for the plaintiffs, if at all, only in certain situations and that BFG acted on its own behalf in other transactions. The memorandum also does not give any indication that C&L knew that the plaintiffs would rely on the audit. Further, even if it could be inferred that

C&L somehow knew that a participant would rely upon the audit, there is nothing from which C&L could have garnered "actual knowledge of the *particular* financial transaction" for which a participant might use the audit (emphasis supplied). *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 498. Some vague notion on the part of C&L that any of the participants might rely upon the audit in planning to execute some future contract with BFG simply does not rise to the level of particularity required by *Nycal*.

For the above reasons, summary judgment was properly granted to the defendants on the claim brought under G. L. c. 93A.

*Judgment affirmed.*