van Gestel, J.
This matter is before the Court on a motion by the defendant, Deloitte & Touche LLP (“Deloitte”), pursuant to Mass.R.Civ.P. Rules 9(b) and 12(b)(6),[1] to dismiss the Third Amended Complaint. The motion originally was filed in the United States District Court for the District of Massachusetts. On February 25, 2004, and before argument on the motion, the case was transferred to this Court following the dismissal of some, and withdrawal thereafter of the remaining, federal securities law claims.
The plaintiff, James R. Young, is Trustee (the “Trustee”) of the NutraMax Litigation Trust (the ‘Trust”). The Trust is an entity established as part of the NutraMax bankruptcy Plan of Reorganization for the purpose of pursuing litigation relating to NutraMax. The Trustee now has further withdrawn, with prejudice, the state law claims of hundreds of shareholders of NutraMax Products, Inc. (“NutraMax”). Thus, at this time, the Trustee is asserting only the remaining claims of NutraMax, certain identified creditors of NutraMax, and 15 specific NutraMax shareholders.
This is said to be the fifth attempted complaint against Deloitte in connection with the matters in issue. Allegedly, it is the fourth complaint filed by the Trustee. The so-called Third Amended Complaint makes a mockery of both the Fed.R.Civ.P. Rule 8(a)(1) and Mass.R.Civ.P. Rule 8(a)(1) requirements that it contain a short and plain statement of the claim. It is 63 pages long, contains 149 separate numbered paragraphs, many with multiple sub-paragraphs, almost all of which are repeated and re-alleged in preface to each of the four “causes of action” pled. Many of the paragraphs read more like a legal brief and closing arguments than the kind of notice pleading mandated, even accepting the pleading particularity required for some of the claims presented.
BACKGROUND
NutraMax is a private-label health and personal care products company based in Gloucester, Massachusetts. NutraMax filed for bankruptcy on May 2, *335 2000, and on Februaiy 6, 2001, re-emerged as a privately-held corporation.
Deloitte was the former independent auditor of NutraMax. It issued unqualified audit opinions with respect to NutraMax’s financial statements for fiscal years ended September 30, 1995, September 28, 1996, September 27, 1997, and October 3, 1998.[2]
The Third Amended Complaint alleges that in 1995 three NutraMax officers — its President and CEO, its Vice President and CFO, and its Controller (the “Officers”) — "falsified NutraMax’s financial statements in many material respects." The complaint does not allege that the Officers did so for their own personal purposes, but rather “to misrepresent NutraMax’s financial performance and condition.”
The essence of the Trustee’s allegations is that “if Deloitte had not ignored the numerous ‘red flags’ that signaled the problems that ultimately produced [NutraMax’s bankruptcy] . . . the NutraMax Board of Directors would have learned about the problems when there was still time to correct them without calamitous effect.”
The Third Amended Complaint concedes, however, that “for fiscal years 1995 through 1998, Deloitte met with NutraMax’s Audit Committee” and in each year communicated to it in writing that Deloitte had noted certain matters, or “reportable conditions,” relating to NutraMax’s system for internal accounting controls that needed to be addressed by the Company. The letters for 1995, 1996 and 1997 each included language to the following effect:[3]
In planning and performing our audit of the consolidated financial statements of NutraMax Products, Inc. (the “Company”) for the year ended September 30, 1995 (on which we have issued our report dated November 3, 1995), we considered its internal control structure in order to determine our auditing procedures for the purposes of expressing an opinion on the consolidated financial statements and not to provide assurance on the internal control structure. However, we note certain matters involving the internal control structure and its operation that we consider to be reportable conditions under standards established by the American Institute of Certified Public Accountants. Reportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control structure that, in our judgment, could adversely affect the Company’s ability to record, process, summarize, and report financial data consistent with the assertions of management in the consolidated financial statements. The reportable conditions that we noted are described below.
The Third Amended Complaint describes in detail the contents of those letters, and claims that the observations by Deloitte were the “red flags” which should have put Deloitte on notice of possible accounting fraud. The Third Amended Complaint acknowledges that during the 1995 through 1998 period Deloitte warned NutraMax’s Audit Committee that, among other things:
the Company was improperly valuing inventoiy;
the Company lacked controls and procedures sufficient to maintain acceptably accurate inventoiy records;
the Company was in default under certain loan agreements because it had misstated the value of accounts receivable that were to be included in the computation of the Company’s permitted borrowing base;
the Company was failing to accurately accrue for year-end bonuses as required by GAAP; and
the Company had no documented accounting policies and procedures, including policies regarding monthly and quarterly reporting; inventoiy costing; spare parts inventoiy; purchasing and related authorizations; cash management; credit and collection; computation of allowances for doubtful accounts and related bad debt write-offs; fixed asset capitalization and depreciation; and business conduct.
As noted in the foregoing letters, Deloitte informed NutraMax, year after year, that while it had considered the Company’s internal control structure to determine auditing procedures, the Company’s failure to correct the deficiencies could adversely affect the Company and the accuracy of its financial reporting. Also, Deloitte made specific recommendations about how to correct the problems.
At the same time, Deloitte also informed NutraMax, year after year, that its audits provided reasonable assurance that NutraMax’s consolidated financial statements were free of material misstatements and fairly presented in all material respects NutraMax’s financial position and results of its operations.
The Trustee in his memorandum in opposition to the present motion includes the following statements:
The Complaint alleges that, although Deloitte discovered certain reportable conditions and disclosed them to NutraMax’s Audit Committee, it failed to employ audit procedures designed to assess the effects of those reportable conditions on the Company’s real financial health and to satisfy itself that NutraMax’s financial data did not contain errors, despite representations that Deloitte would do so. Nonetheless, Deloitte specifically reassured NutraMax’s Audit Committee, as well as investors and lenders, that its audits complied with professional standards and that the financial statements it certified were based on GAAP.
The several problems with NutraMax’s financial condition did not come to light until 1999, after the *336 Board of directors engaged a new CFO. On November 12, 1999, Deloitte formally withdrew its audit reports with respect to NutraMax’s 1996, 1997, and 1998 financial statements.
The Third Amended Complaint contains no allegations that NutraMax took any steps to investigate or address the reportable conditions and other matters identified by Deloitte, or to implement Deloitte’s recommendations . According to the Third Amended Complaint, however, at the same time that the NutraMax Audit Committee was receiving and ignoring Deloitte’s warnings, NutraMax’s management was engaging in accounting fraud by exploiting the veiy internal control weaknesses that Deloitte had identified.
Three of the 15 identified shareholders for whom the claims are being brought by the Trustee, including the largest shareholder, and who claim to have been misled by Deloitte, held seats on the Board of Directors and the Audit Committee, and presumably were aware of Deloitte’s communications.
The Third Amended Complaint contains no allegations of the existence of any privity between Deloitte and any of the shareholders or creditors of NutraMax, nor does it allege that Deloitte had actual knowledge that each of those shareholders and creditors would rely on its statements. Nor is there any allegation that any of the claimants actually read and relied on Deloitte’s audit reports.
The claims in the Third Amended Complaint charge Deloitte with common-law fraud, negligent misrepresentation, violation of G.L.c. 93A and professional malpractice. It is significant to note that this is not a class action, nor is it a shareholder’s derivative suit. Rather, the Trustee speaks in apparently multiple tongues for each individual shareholder and creditor, as well as for the NutraMax corporation, whose several individual claims were assigned to the Trust by order of the bankruptcy court.
DISCUSSION
A Rule 12(b)(6) motion admits all well-pleaded allegations of the Third Amended Complaint, and the Court must accept as true such inferences as may be drawn in the Trustee’s favor. Fairneny v. Savogram Co., 422 Mass. 469, 470 (1996); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(b)(6) motion. The claims here, however, are sufficient to survive under Rule 12(b)(6) unless they show beyond doubt that no provable set of facts would entitle the Trustee to relief. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). The Trustee bears a “relatively light burden,” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), and must be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979).
Indeed, as the Supreme Judicial Court, when discussing its own duties regarding a motion to dismiss, has so recently reminded this particular Court:
The standard of review for a motion to dismiss pursuant to Rule 12(b)(6) is well settled. We take as true “ ‘the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs favor . . .’ Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient ‘unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’ Nader v. Citron, 372 Mass, 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998). Although errors of law based on the facts alleged will not surmount a rule 12(b)(6) challenge, the plaintiffs burden is “relatively light.” Id., citing Gibbs Ford, Inc. v. United Truck Leasing Corp., 399 Mass. 8, 13 (1987). Under the “generous principles” governing our review Connerty v. Metropolitan Dist. Comm’n, 398 Mass. 140, 143 (1986), we summarize the facts alleged in the . . . complaint and in uncontested documents of record.
Marram v. Kobrick Offshore Funds, Ltd., 442 Mass. 43, 45 (2004).
Here, of course, in assessing the third amended complaint, this Court is not addressing a tabula rasa. Other courts, assessing earlier incarnations of the Trustee’s claims, have found many of those claims to be wanting. Nevertheless, this Court has a duty to decide on its own, based on what it is that is before it.
First, the Court observes that it, unlike prior courts, is addressing a complaint making only Massachusetts state law claims. No Federal claims are before it.
Second, there are two rather distinct and separate claimants or groups of claimants — the 15 shareholders and the creditors, on the one hand, and NutraMax itself on the other hand — and the law is somewhat different with regard to these two claimants.[4]
The Court will deal with the claims against the shareholders and creditors separately from the claims against NutraMax itself.
Claims Brought by the Shareholders and Creditors Fraud and negligent misrepresentation.
In the First Cause of Action the shareholders and creditors group charge Deloitte with common-law fraud, and in the Second Cause of Action they charge Deloitte with negligent misrepresentation. Mass.R.Civ.P. Rule 9(b) “requires that allegations of fraud and deceit must be pleaded with particularity.” Equipment & Systems for Industry, Inc. v. Northmeadows Construction Co, Inc., 59 Mass.App.Ct. 931 (2003). “At a minimum, [the Trustee] alleging *337 fraud must particularize . . . the contents of the misrepresentation, and where and when it took place. In addition the [Trustee] should specify the materiality of the misrepresentation, . . . reliance thereon, and resulting harm.” Id. at 931-32. See also Friedman v. Jablonski, 371 Mass. 482, 488-89 (1976).
“As with fraud, a claim of negligent misrepresentation requires plaintiffs to plead reliance with particularity.” Sebago, Inc. v. Beazer East, Inc., 18 F.Sup.2d 70, 95 (D.Mass. 1998).
In each of paragraphs 117 and 119 "of the First Cause of Action, and paragraph 130 of the Second Cause of Action, it is alleged that the shareholders or the creditors, as the case may be, “justifiably relied upon Deloitte’s false statements and misrepresentations” in taking certain action. This is enough at this stage of the case. See Friedman, supra, 371 Mass. at 488-89; Cardone v. Perez, 57 Mass.App.Ct. 1103 (2003) (pursuant to Rule 1:28).
It is true, however, that, as Deloitte points out, there are no allegations demonstrating any individualized reliance by any single shareholder or creditor. See Brockton Savings Bank v. Peat, Marwick, Mitchel & Co., 577 F.Sup. 1281, 1287 (D.Mass. 1983) (dismissing fraud and negligent misrepresentation claims where plaintiff failed to “allege in any way that it read, received or even knew of the” alleged misrepresentations prior to its purchase of securities). Discovery may reveal in detail the presence or absence of reliance for each individual shareholder and creditor involved. Motions under Rule 56 can more properly bring these issues before the Court. See, e.g., In re Bank of Boston Corp. Sec. Litig., 762 F.Sup. 1525, 1536 (D.Mass. 1991). For purposes of assessing the Third Amended Complaint on a motion to dismiss, this Court cannot rule that there was a decisive failure in pleading on the issue of reliance.
There is a reference in paragraph 113 of the Third Amended Complaint that sounds somewhat like a claim for fraud on the market. No case has been brought to the attention of this Court, nor has it found any itself holding that Massachusetts common law applies the fraud-on-the-market doctrine to fraud or negligent misrepresentation claims. Indeed, the Trustee seems to concede as much, albeit somewhat obliquely. See Trustee’s memorandum in opposition at p. 8. This trial Court, however, is not the place where new causes of action or claims of this nature should be spawned. Thus, to the extent or degree that the First or Second Causes of Action are predicated on a fraud-on-the-market theory they must, in that limited regard, be dismissed.
Before leaving the First and Second Causes of Action, the Court next considers the teachings of Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491 (1998). In Nycal, the Supreme Judicial Court addressed for the first time “the scope of Iiabiliiy of an accountant to persons with whom the accountant is not in privity.” Id. at 493. In doing so, it adopted a test taken from Sec. 552 of the Restatement (Second) of Torts. Id at 497-98.
Sec. 552 describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
That liability is limited to
loss suffered (a) by a person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The SJC, id. at 497, particularly adopted comment h to Sec. 552 of the Restatement, which reads as follows:
[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it ... It is sufficient, in other words, insofar as the plaintiff s identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
In Nycal, the SJC concurs with the California Supreme Court’s holding in Bily v. Arthur Young & Co., 3 Cal.4th 370, 394, 834 P.2d 745, 769 (1992), that Sec. 552 appropriately recognizes the commercial realities in play. Id. at 497. In Bily, the California court spoke of both negligent misrepresentations and “intentional fraud in the preparation and dissemination of an audit report.” Bily, supra, 834 P.2d at 747.
As noted at the beginning of this memorandum, the Third Amended Complaint takes a blunderbuss approach to the situation. It is not, therefore, readily *338 digestible for a Court when ruling on a motion to dismiss.[5] Consequently, the Court may, in its reading, have missed something buried in the mass of words. However, it did not find any allegations to the effect that Deloitte intended its annual audits to reach and influence either a particular shareholder or creditor, known to it, or a group or class of shareholders or creditors, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon those audits.[6] As stated in comment h to Sec. 552, “It is not enough that [Deloitte] merely knows of the ever-present possibility of repetition [of its audits] to anyone, and the possibility of action in reliance upon [them], on the part of anyone to whom [they] may be repeated.”
At this stage of the pleadings in this case — said to be the fifth proposed complaint — this failure is significant, and must be seen as more than just a scrivener’s oversight. It seems quite appropriate for this Court to decline to infer that the necessary allegations relating to Deloitte’s intent regarding the use of its audits can be made in a manner consistent with Nycal and compliant with the strictures of Mass. R. Civ. P. Rule 11. For these reasons, the First and Second Causes of Action by the shareholders and creditors should be dismissed.

Chapter 93A.

The Third Cause of Action by the shareholders and creditors seeks relief for alleged violations of G.L.c. 93A. Deloitte attacks this cause of action for four separate reasons: (1) that this is a claim under Sec. 9 and there was no pre-suit demand letter; (2) that there was no commercial relationship between Deloitte and the shareholders or creditors; (3) that the acts did not occur primarily and substantially within the Commonwealth; and (4) that there are no allegations of individualized causation.
As to the issue relating to the demand letter — although the facts recited in Deloitte’s memorandum at pp. 12-13 seem compelling — this is a hearing on a motion to dismiss, not on summary judgment. The Court is, therefore, confined to examining the Third Amended Complaint and not facts beyond its four comers. None of the procedural history recited in Deloitte’s memorandum appears in the complaint. And neither side argues that there is a failure of pleading on this aspect of the c. 93A claim. In short, this ultimately may be a winning argument for Deloitte, but it is not on a Rule 12 motion.
In Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459 (2003), the SJC ruled that “a judge should, after making findings of fact, and after considering those findings, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” (Emphasis added). Id. at 473. While this Court knows a lot about the Kuwaiti Danish case, it is not at all sure, but presumes from reading the SJC’s opinion, that this particular ground for challenging a c. 93A claim — absent some extraordinary pleading concession by a claimant — cannot be resolved on a Rule 12 motion.
On the issue of whether there was the necessary commercial relationship between Deloitte and the shareholders or creditors both sides cite to Spencer v. Doyle, 50 Mass.App.Ct. 6 (2000). In reaching its decision in Spencer, the Appeals Court explored the issue of whether a corporation, there called “BFG,” contracted with C&L, the accounting firm of Coopers & Lybrand, in order to facilitate BFG’s independent business goals or instead to facilitate investment in BFG’s business. Id. at 10. Here, the equivalent of BFG is NutraMax and the equivalent of C&L is Deloitte.
In Spencer, after concluding that C&L was engaged as accountants to conduct an audit to prepare for a possible future public offering of BFG, the Appeals Court concluded that C&L was not engaged to create an audit to be used to solicit investments in BFG’s ongoing business. The Appeals Court then held that “there was no commercial relationship between [the investors in BFG’s ongoing business] which placed C&L and the plaintiffs in privity with one another.” Id. at 12. Consequently, the c. 93A claim failed in Spencer, and for similar reasons it must fail here. Deloitte was engaged to do annual audits of the financial statements of NutraMax, not to help NutraMax solicit people to become shareholders or creditors. The relationship, if any, between Deloitte and the shareholders and creditors was at most a minor or insignificant business relationship. See, e.g., Reisman v. KPMG Peat Marwick LLP, 57 Mass.App.Ct. 100, 125a (2003); Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 551 (1995).

Professional malpractice.

The fourth of the shareholders’ and creditors’ claims against Deloitte is for professional malpractice. The Trustee argues that, despite the fact that the shareholders and creditors were not clients of Deloitte, the professional malpractice claim should survive against them “[b]ecause the Complaint’s allegations satisfy NycaL” See Trustee’s memorandum in opposition at p. 13. This Court, however, has already ruled that the First and Second Causes of Action of the Third Amended Complaint by the shareholders and the creditors does not satisfy Nycal. For that same reason, Nycal provides no basis to extend Deloitte’s professional malpractice liability to them; indeed, it demonstrates just the opposite.
Claims Brought by NutraMax
The claims brought by NutraMax consist of three of the four claims brought' by the shareholders and creditors: fraud; violation of G.L.c. 93A; and professional malpractice.
*339 The Court begins with some general observations about the nature of a corporation, and through whom and how it acts.
A corporation
is a viable legal person separate and distinct from its shareholders, officers and employees, possessing virtually all of the legal attributes of a natural person. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618-19 (1968). Most pertinently, it has the capacity to make . . . contracts and to sue and be sued, see G.L.c. 156B, §9(b), (h), and to be held both civilly and criminally responsible (including as an aider and abettor) for actionable wrongs committed by its responsible officers. See Commonwealth v. Beneficial Fin. Co., 360 Mass. 188, 249-50, 253-55, 270-71, 276-81 (1971), cert. denied, 407 U.S. 914 (1972); Kyte v. Philip Morris, Inc., 408 Mass. 162, 166-69 (1990); Model Penal Code and Commentaries §2.07(l)(a), (l)(c), (4)(c) and comments (1980).
Beaupre v. Cliff Smith & Associates, 50 Mass.App.Ct. 480, 494 (2000).
A corporation can only act through its officers and directors, and those others who are its agents.
A corporation is a separate and distinct legal entity. See Spaneas v. Travelers Indem. Co., 423 Mass. 352, 354 (1996); Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 625-26 (1990). A corporation, however, can only act through its agents. See Commonwealth v. L.A.L. Corp., 400 Mass. 737, 743 (1987), Commonwealth v. Beneficial Fin. Co., 360 Mass. 188 (1971), cert. denied sub nom. Farrell v. Massachusetts, 407 U.S. 910, and sub nom. Beneficial Fin. Co. v. Massachusetts, 407 U.S. 914 (1972).
Under agency principles, notice to a corporation’s agent is notice to the corporation. “When an agent acquires knowledge in the scope of [his] employment, the principal... is held to have constructive knowledge of that information.” DeVaux v. American Home Assur. Co., 387 Mass. 814, 818 (1983), citing Bockser v. Dorchester Mut. Fire Ins. Co., 327 Mass. 473, 477-78 (1951), and Union Old Lowell Nat’l Bank v. Paine, 318 Mass. 313, 323-24 (1945). Juergens v. Venture Capital Corp., 1 Mass.App.Ct. 274, 278 (1973) (corporate officer’s knowledge of transaction was constructive notice to corporation). However, an agent’s knowledge of his own unauthorized acts is not imputed to the principal when the agent has acted fraudulently toward the principal and is engaged in an independent fraudulent act from which the principal does not benefit. Tremont Trust Co. v. Noyes, 246 Mass. 197, 207 (1923). See Restatement (Second) of Agency, §282 (1958) (“[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another’s purposes”).
Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 66-67 (1997).
However, when a senior officer of a corporation, like its president, who is clearly an agent of the corporation and “who was acting within the scope of his employment when he learned of circumstances that might give rise to a claim against both him and [the corporation] . . . under ordinary agency principles, [his] knowledge is imputed to [the corporation]. Id. at 67.
“Ultra vires is not a defence to an action to recover damages against a corporation on account of the fraud of one of its officers acting within the scope of his authority, even if it was perpetrated in a transaction in which the corporation was not authorized to engage.” McCarthy v. Brockton National Bank, 314 Mass. 318, 324-25 (1943).
“The general rule ... is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation.” Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 427 F.2d 862 (4th Cir. 1970), quoting William Danzer & Co. v. Western Md. Ry., 164 Md. 448, 457, 165 A. 463 (1933). However, “knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation.” Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 250 (4th Cir. 1967), remanded, 302 F.Sup. 832 (D.Md. 1969), rev'd on other grounds, 427 F.2d 862 (4th Cir. 1970). See Fletcher, Cyclopedia of Corporations §826 (rev. ed. 1994) (general rule of not imputing knowledge to corporation not applicable where “board of directors has... complete control and direction of all of the business and affairs of the institution, and the president has habitually exercised the same”). When “all corporate power is exercised by a few who perform misdeeds, knowledge of those misdeeds must be imputed to the corporation.” Phoenix Sav. & Loan, Inc. v. Aetna Cos. & Sur. Co., 302 F.Sup. 832, 840 (D.Md. 1969). See Jefferson Park Realty Corp. v. Ridgely, 99 Ind.App. 146, 164 (1934), quoting Thompson, Corporations §1777 (3d ed. 1927) (“if [an agent] is the sole representative in the transaction, and is in effect the alter ego, notice to him is imputable to the [corporation]”).
Demoulas v. Demoulas, 428 Mass. 555, 584-85 (1998).
It is with this general background that the Court now considers the claims brought on behalf of NutraMax.
As noted in the Background section above, the third amended complaint contends that in 1995 three NutraMax officers — its President and CFO, its Vice President and CFO and its Controller — "falsified NutraMax’s financial statements in many material respects." Third Amended Complaint, para. 2. The *340 complaint does not allege that the Officers did so for their own personal purposes, however, but rather “in order to meet earnings expectations and fraudulently to maintain the Company’s access to debt financing by falsifying base reports.” See, e.g., Third Amended Complaint, para. 100. These are allegations of fact which are binding on the Trustee. G.L.c. 231, Sec. 87.
By the Massachusetts law rehearsed above, these allegations are also imputed to and binding upon NutraMax as knowledge of officers and directors having substantial control of the activities of the corporation.
The Third Amended Complaint, at para. 2, also alleges the binding facts that the improper activities of its Officers began in 1995. There are further factual allegations regarding things that occurred “at least as early as September 1996.” See Third Amended Complaint, paras. 28-30. This case was transferred to this Court in February 2004, having apparently been first filed by the Trustee in the U.S. District Court in March 2001. These facts present statute of limitations issues.
Under Massachusetts law, the statute of limitations for fraud claims is three years after the plaintiff learns or reasonably should have learned of the alleged misrepresentations. G.L.c. 260, 2A; Kent v. Dupree, 13 Mass.App.Ct. 44, 47 (1982). Asimilar three-year statute of limitations applies to professional malpractice claims. G.L.c. 260, Sec. 4; Frank Cooke, Inc. v. Hurwitz, 10 Mass.App.Ct. 99, 109-11 (1980).
The statute of limitations for G.L.c. 93A claims is four years. G.L.c. 260, Sec. 5A; Inter-national Mobiles Corp. v. Coroon & Black/Fairfield & Ellis, Inc., 29 Mass.App.Ct. 215, 220-21 (1990).
Given the knowledge of the Officers, imputed to NutraMax, there is nothing inherently unknowable about the alleged fraud, professional malpractice or c. 93A claims here. NutraMax certainly had reasonable “(c)ause to inquire about facts giving rise to [each of these] cause[s] of action.” Salinsky v. Perma-Home Corp., 15 Mass.App.Ct. 193, 197 n.6 (1983). Consequently, the three-year statutes of limitations bar any claims by NutraMax for fraud or professional malpractice against Deloitte arising out of the 1995, 1996 and 1997 audits. The fraud and professional malpractice claims relating to the 1998 audit, however, are not barred for statute of limitations reasons. Similarly, the c. 93A claims relating to the 1995 and 1996 audits are barred by the limitation of actions provision, but the claims relating to the 1997 and 1998 audits are not.
Deloitte next argues that whatever remains of the fraud and professional malpractice claims for the 1998 audit, and the c. 93A claims for the 1997 and 1998 audits, should be dismissed because there are not sufficient allegations by NutraMax of reliance or causation.
To this Court, the rub is that, despite NutraMax’s imputed knowledge of what its Officers may have been doing, and its actual knowledge of what its Audit Committee had been told by Deloitte, Deloitte nevertheless provided unqualified audits for each of the four fiscal years from 1995 to 1998.-Whether those unqualified audits for the 1997 and 1998 audit years not eliminated by the c. 93A limitations period, or the 1998 audit year not eliminated by the fraud and professional malpractice limitations periods, met the minimum standards applicable to Deloitte cannot be determined on the present Rule 12 motion. As independent auditors, Deloitte should, at a minimum, have complied with generally accepted accounting standards in conducting its several audits. Can there be compliance and still provide an annual audit opinion that NutraMax’s financial statements were free of material misstatements?
Whether such compliance was met, and what harm was caused by any failure — in the face of Deloitte’s reporting “reportable conditions” involving “significant deficiencies,” making recommendations for corrective action and continually seeing none, while still issuing unqualified audits thereafter — certainly is not beyond the allegations pled in the Third Amended Complaint or the reasonable inferences to be drawn therefrom.
ORDER
For the foregoing reasons, the Court makes the following rulings on Defendant Deloitte & Touche LLP’s Motion to Dismiss the Third Amended Complaint (Paper #52): (1) as to all claims by the shareholders and creditors, the motion is ALLOWED; and as to those claims by NutraMax Products, Inc. relating to audit years 1995, 1996 and 1997 for fraud and professional malpractice, and as to those claims by it for violations of G.L.c. 93A relating to audit years 1995 and 1996, the motion is ALLOWED. As to the fraud and professional malpractice claims of NutraMax Products, Inc. relating to audit year 1998, and as to the G.L.c. 93A claims of NutraMax Products, Inc. relating to audit years 1997 and 1998, the motion is DENIED.

The motion, when originally filed, cited the cognate Federal Rules of Civil Procedure.

The Court is uncertain why Deloitte’s letters for each of the years in issue suggest that NutraMax’s fiscal year ended on slightly different dates, rather than on the more customary final day of the last month of the fiscal year. Nothing turns on this point.

What is included here is the language taken from the Deloitte letter to the Audit Committee dated November 3, 1995.

For purposes of this discussion, the Court will treat the group of claimants made up of the shareholders and the creditors as one claimant and NutraMax as the other claimant.

 The party submitting the particular pleading, however, not the Court, must accept the consequences that flow from his chosen drafting style.

In its review of the Third Amended Complaint for this purpose, the Court focused particularly on paragraphs 33-34, 50, 66-67, 69-70, 80, 88, 91, 101, 103 and 123 cited in that section of the Trustee’s memorandum in opposition at p. 11, where he argues that his claims survive the Nycal test.